Terrell D. HARGRAVES, Appellant,

v.

UNITED STATES, Appellee.

Brian K. Gilliam, Appellant,

v.

United States, Appellee.

Ronald L. English, Appellant,

v.

United States, Appellee.

Nos. 08–CF–346, 08–CF–376, 08–CF–474.

District of Columbia Court of Appeals.

Argued June 27, 2012.

Decided March 7, 2013.*

---

* The opinion in these consolidated appeals originally issued on January 17, 2013. The court vacated that opinion and substituted this amended opinion on March 7, 2013.

Marc L. Resnick for appellant Terrell D. Hargraves.

Montrell L. Scaife for appellant Brian K. Gilliam.

Stefanie Schneider, Public Defender Service, with whom James Klein and Shilpa S. Satoskar, Public Defender Service, were on the brief, for appellant Ronald L. English.

Peter S. Smith, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Thomas A. Gillice, Assistant United States Attorney, were on the brief, for appellee.

Before GLICKMAN and FISHER, Associate Judges, and NEWMAN, Senior Judge.

## ORDER

PER CURIAM.

On further consideration of this court's opinion that issued on January 17, 2013, the motion of appellant English to depub-lish and amend the court's opinion, and the opposition thereto, it is

ORDERED that the motion of appellant English is granted to the extent that the opinion and order entered on January 17, 2013, are hereby vacated. A new published opinion shall be issued in conjunction with this order.

GLICKMAN, Associate Judge:

On December 1, 2006, appellants Terrell Hargraves, Brian Gilliam, and Ronald English were jointly charged by indictment with multiple offenses arising from a shooting and homicide on March 7, 2006, in the vicinity of 30th and P Streets, S.E. The charges included conspiracy to commit first-degree murder while armed; the premeditated first-degree murder while armed of Michael Beckham; assault with intent to kill while armed ("AWIKWA") on Dennis Austin; AWIKWA on Tia Davis, which was reduced at trial to the lesser-included charge of assault with a dangerous weapon ("ADW"); three counts of possession of a firearm during a crime of violence ("PFCV") (correlated with the murder and assault counts); carrying a pistol without a license ("CPWL"); and fleeing from a law enforcement officer in a motor vehicle.

Appellants' joint trial commenced on November 14, 2007. On December 19, 2007, the jury rendered its verdict. The jury found Hargraves guilty of fleeing from a law enforcement officer[1] and acquitted him of the other charges. The jury found Gilliam and English guilty of voluntary manslaughter (as a lesser-included offense of first-degree murder), ADW (Davis), the two associated PFCV counts, carrying a pistol without a license, and fleeing. Gilliam and English were acquit-

---

1. D.C.Code § 50–2201.05b (2009).

ted of conspiracy, murder, and the other charged offenses.

Appellants challenge their convictions on diverse grounds. Gilliam contends the trial judge erred in finding him competent to stand trial. Both he and Hargraves argue that the judge abused his discretion in denying their motions for severance. English argues that a ruling by the judge on the order of proof at trial unreasonably impaired his defense presentation and violated his constitutional rights.

We conclude that the judge did not commit any error entitling Hargraves, Gilliam, or English to relief.

## I. Factual Background

A brief overview of the trial will suffice to set the stage for our discussion of appellants' claims of error. The charges arose from an encounter between the occupants of two vehicles—a Chevy Tahoe sport-utility vehicle ("SUV") carrying appellants Hargraves, Gilliam, and English and a Ford Thunderbird carrying Beckham, Austin, and Davis—that left Beckham dead and Austin injured. Appellants and Davis escaped unhurt.

The government presented evidence that appellants conspired to kill Beckham, whom they blamed for the murder of their friend. In furtherance of their plan, appellants allegedly followed the Thunderbird on the morning of March 7, 2006, to 30th and P Streets, S.E., where English and Gilliam started shooting into the vehicle from their SUV. Austin was wounded in the fusillade. According to the government's witnesses, English and Gilliam then chased Beckham on foot, while Hargraves remained in the SUV. English caught up to him in the yard of a nearby house and shot him multiple times. Beckham was unarmed. Meanwhile, Gilliam allegedly shot at Austin as Austin drove away. Gilliam and English then jumped back into the SUV, which immediately sped off. Appellants led police on a prolonged high-speed chase, which ended when the SUV crashed and appellants were arrested.

The defense, spearheaded by appellant English, presented a different account of what happened. According to English (the only defendant who testified at trial), there was no plan to kill Beckham and they did not attack him or his car. Rather, Beckham, who previously had threatened to kill appellants and was reputed in the neighborhood to have committed more than one murder and other acts of violence, followed appellants in the Thunderbird and fired shots at them without provocation. English, who admitted being armed himself, was taken by surprise and fired back. English claimed he then left the SUV and ran towards P Street. As he did, he saw Beckham shooting at him from behind the Thunderbird and shot back. Beckham fell to the ground but then got up and chased English onto Q Street. When Beckham had nearly caught up with him, English, fearing for his life, shot Beckham multiple times in self-defense until his gun was empty.

The jury evidently rejected the government's theory of the case and credited English's testimony when it acquitted appellants of conspiracy, murder, and assault with intent to kill while armed. But the jury showed it was not convinced that appellants acted properly in self-defense by convicting Gilliam and English of voluntary manslaughter, ADW, and PFCV. In settling on that particular verdict, it seems the jury must have found that appellants acted in "imperfect" self-defense, i.e., that they subjectively believed themselves in imminent danger of death or serious bodily harm and believed they needed to use deadly force to repel the danger but that one or both of those beliefs was objectively

unreasonable.[2] It is undisputed that the evidence at trial permitted such a determination.

## II. Appellant Gilliam's Competence to Stand Trial

■ The Due Process Clause of the Fifth (and Fourteenth) Amendment prohibits the criminal prosecution of a defendant who is incompetent to stand trial.[3] In this jurisdiction, procedures for evaluating a defendant's competence are spelled out in the Incompetent Defendants Criminal Commitment Act of 2004 (hereinafter, the "Act" or the "IDCCA").[4] The Act provides that " '[c]ompetence' means that a defendant has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and has a rational, as well as a factual, understanding of the proceedings against him or her." [5] When a question is raised as to a defendant's competence, the trial court shall order a preliminary screening examination and, if appropriate, a full competence examination.[6] The examination is to be performed, in each instance, by a psychiatrist or psychologist affiliated with the Department of Mental Health.[7] A hearing to determine whether the defendant is competent to stand trial shall be scheduled promptly after the written report of the full competence examination is received.[8] At that hearing, the defendant is presumed to be competent; the party asserting his incompetence has the burden of proving it by a preponderance of the evidence.[9] If the court finds that the defendant is incompetent but may attain competence in the foreseeable future, it may order treatment for the restoration of competence.[10] After the treatment provider reports back to the court in writing on whether the defendant's condition has improved or is likely to do so, the court "shall hold a prompt hearing ... and make a new finding" as to whether the defendant has become competent to stand trial.[11] Appellate review of a competency finding is deferential because the determination is "primarily factual in nature." [12]

2. *See Swann v. United States*, 648 A.2d 928, 930–32 (D.C.1994).

3. *Medina v. California*, 505 U.S. 437, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992).

4. D.C. Law 15–358 (May 24, 2005), codified at D.C.Code §§ 24–531.01–.13 (2012 Supp.). The Act repealed the statutory provisions formerly governing competency determinations in criminal proceedings, subsections (a), (a–1), and (b) of D.C.Code § 24–501.

5. D.C.Code § 24–531.01(1). This standard of competence to stand trial is mandated by due process. *Gorbey v. United States*, 54 A.3d 668, 678 (D.C.2012).

6. *Id.* § 24–531.03(b), (c)(4)(B).

7. *Id.* § 24–531.03(c)(1), (d)(1).

8. *See* D.C.Code §§ 24–531.03(f), (g) and 24–531.04. *Cf. Phenis v. United States*, 909 A.2d 138, 152 (D.C.2006) ("Where there is evidence raising a substantial doubt as to a defendant's competency to stand trial, the trial judge is under a constitutional duty to order a hearing sua sponte.") (quoting *Holmes v. United States*, 407 A.2d 705, 706 (D.C.1979)) (internal quotation marks omitted).

9. D.C.Code § 24–531.04(b); *see Medina*, 505 U.S. at 451–53, 112 S.Ct. 2572 (holding that the state may, consistent with due process, require a defendant to prove incompetence by a preponderance of the evidence).

10. *See* D.C.Code §§ 24–531.04(c)(3), .05; *see Medina*, 505 U.S. at 448, 112 S.Ct. 2572 ("If a defendant is incompetent, due process considerations require suspension of the criminal trial until such time, if any, that the defendant regains the capacity to participate in his defense and understand the proceedings against him.").

11. D.C.Code § 24–531.06(a).

12. *Wallace v. United States*, 936 A.2d 757, 763 n. 11 (D.C.2007) (internal quotation marks omitted) (quoting *United States v. Izquierdo,*

■ Questions were raised about appellant Gilliam's competence almost immediately following his arrest in March 2006. In addressing those questions, the trial court substantially followed the procedures mandated by the IDCCA. Ultimately, the trial judge was satisfied that Gilliam was competent to stand trial. Gilliam contends the judge abused his discretion in so finding.

On March 10, 2006, three days after appellants were arrested, Dr. Elizabeth Teegarden, a psychologist, conducted a preliminary competency screening examination of Gilliam pursuant to court order. According to her report, Gilliam had been diagnosed in 2001 with Polysubstance Dependence and Substance–Induced Psychotic Disorder "due to the symptoms that surfaced around his periods of substance abuse." When Dr. Teegarden interviewed him on March 10, Gilliam initially was alert and cooperative, but when she asked him about his "legal issues," he stopped responding to her questions and proceeded to stare at her in silence for several minutes. As a result of his non-cooperation, Dr. Teegarden was unable to render an opinion as to his competency. Upon receiving this report, the court ordered a full competency examination.

Eventually, Dr. Bruce Cambosos, a psychiatrist, reported that Gilliam, who was then housed in a mental health treatment unit at the D.C. Jail, was not competent to stand trial. Dr. Cambosos noted that Gilliam refused to talk about his criminal charge and described Gilliam's responses to other questions as "vague, rambling, and disorganized." Relying "substantially" on Dr. Cambosos's report, the court on September 8, 2006, found Gilliam to be incompetent. In the expectation that he could attain competence with appropriate treatment, the judge ordered him transferred to St. Elizabeths Hospital for a period not to exceed 180 days.

A month later, on October 6, 2006, St. Elizabeths reported that Gilliam had been receiving antipsychotic medication (prolixin) and was competent to stand trial.[13] The report stated that Gilliam did not need to remain hospitalized but should continue on his medication "to assure [his] continued competency." The hospital's report was not contested, and on October 12, 2006, the court ordered that Gilliam be transferred back to the D.C. Jail.

Within a few months, however, there were renewed concerns about Gilliam's mental status and his ability to assist his attorneys. Pursuant to court order, Dr. Nancy Ingraham, a psychologist, performed another competency screening examination of Gilliam on April 6, 2007. Evidently Gilliam's condition had deteriorated at the Jail; Dr. Ingraham found him confused and incapable of discussing his criminal charges or assisting his attorney in preparing his defense. She opined that Gilliam was "currently" incompetent.

The judge discussed Dr. Ingraham's preliminary screening assessment with Gilliam's counsel at a hearing on April 10, 2007. Counsel agreed that Gilliam appar-

---

448 F.3d 1269, 1278 (11th Cir.2006)); *see also Bennett v. United States*, 400 A.2d 322, 325 (D.C.1979) ("[C]ompetency determinations are within the discretion of the trial judge and are entitled to great deference. A finding of competency will not be set aside upon review unless it is clearly arbitrary or erroneous.") (internal citations and quotation marks omitted).

13. Gilliam was diagnosed with "Psychotic Disorder NOS [Not Otherwise Specified], Polysubstance Dependence, By History[,] and Personality Disorder with Antisocial Features."

ently had attained competence during his stay at St. Elizabeths and expressed concern that the hospital had released him prematurely. The judge ordered that Gilliam be returned to St. Elizabeths for further treatment and requested a report from the hospital by mid-May.

St. Elizabeths filed its report with the court on May 9, 2007. The judge was informed of it the next day at a hearing that had been scheduled to address other matters. The report stated that Gilliam had been diagnosed with catatonic schizophrenia, "in partial remission," in addition to his previous diagnoses; that he was being treated with two medications (zydis and haldol decanoate), which he received by injection every four weeks; that he was competent to stand trial; and that he did not need to remain hospitalized but should continue with his medication pending trial to assure his continued competency. This was the last written report on Gilliam's competency received by the court before his trial. No party disagreed with it or requested a competency hearing. The judge signed an order directing that Gilliam be transferred back to the D.C. Jail, but on defense counsel's motion, he subsequently was returned to St. Elizabeths.[14]

A few months passed. Then, at a pretrial hearing on October 25, 2007, three weeks before trial was to commence, Gilliam's counsel sought a continuance. Counsel explained that Gilliam was "in better condition now than he was when he was at the Jail, but he still hasn't been able to assist us with his defense." "[H]e can talk about everything else," counsel stated, "but he just has a blank when it comes to talking about [his case]."[15] The trial judge recalled that Gilliam had been found competent at St. Elizabeths a few months earlier and was being kept there so that he would stay competent and not deteriorate, and he noted that Gilliam's failure to work with his attorney could have been intentional and did not necessarily mean he was incompetent. Because counsel lacked an expert medical opinion contradicting the hospital's assessment that Gilliam was competent to stand trial, the judge perceived no legal grounds on which to grant a continuance of the trial. Nonetheless, acknowledging that it would be improper to proceed with Gilliam's trial if he indeed had become incompetent, the judge stated that he would "call over" to St. Elizabeths and ask Gilliam's doctors to advise in writing whether Gilliam was "still competent or not." Counsel did not object to that inquiry or request the judge to hold a hearing on Gilliam's competency.

When the parties returned to court five days later, on October 30, the judge announced that he had contacted St. Elizabeths and requested "something that says whether he's competent or not." In addition, the judge stated, he would order that Gilliam remain at St. Elizabeths until his trial was over to ensure that his competency would continue to be supported. Gilliam's counsel sought no additional relief.

Unfortunately, the hospital did not furnish another written report on Gilliam's competency before trial began on November 14, 2007. We have no indication in the record that the judge received an oral

---

**14.** Gilliam requested his transfer back to St. Elizabeths in a motion filed on June 22, 2007. It is not clear from the record when the judge granted the request, but a post-trial report on Gilliam's competency indicates that he was returned to St. Elizabeths on September 28, 2007.

**15.** The judge expressed dismay that counsel had waited so long to bring this problem to his attention. "You knew he wouldn't talk the first time he wouldn't talk," the judge observed. To that, counsel responded, "No, I didn't. And I've been going over there, taking him my discovery."

report from the hospital. However, a post-trial competency report prepared by Dr. Teegarden in preparation for sentencing stated that Gilliam had been "evaluated as competent for trial" *during* his inpatient treatment at St. Elizabeths from September 28 to December 31, 2007,[16] and in Dr. Teegarden's opinion he was still competent when she examined him on March 3, 2008.[17] During trial, Gilliam's behavior raised no red flags. When the judge conducted a *Boyd* inquiry into his decision not to testify,[18] Gilliam responded appropriately: He agreed that he had been afforded sufficient opportunity to discuss the decision with his lawyers; declared that his decision was to "[r]emain silent"; denied that anyone had pressured him not to testify; and said he had no questions about his rights to testify or remain silent.

■ On this record, we cannot agree that the judge erred in finding Gilliam competent to stand trial. That finding is supported by the May 2007 evaluation of Gilliam at St. Elizabeths and corroborated by Gilliam's satisfactory behavior at trial, his responses to the *Boyd* inquiry, and Dr. Teegarden's post-trial report and assessment. Despite the initial evaluations of incompetency and Gilliam's deterioration during his stays at the Jail, he evidently responded favorably to the inpatient treatment and medication provided at St. Elizabeths to help him attain competency. Having arranged for Gilliam to remain at St. Elizabeths instead of returning him to the Jail, the judge had reason to believe Gilliam would maintain competency through trial. Gilliam and his counsel did not shoulder the burden of proving otherwise. Under these circumstances, counsel's report of communication problems on October 25, 2007, by itself did not suffice to raise a substantial doubt about Gilliam's competence to stand trial.[19] The judge was willing to reconsider the question should there be additional evidence of incompetency, but the defense did not proffer it or otherwise pursue the issue before proceeding to trial, even though St. Elizabeths failed to furnish the supplemental report that the judge requested. Gilliam argues that the judge deviated from the requirements of the IDCCA by not conducting a competency hearing after receiving the May 2007 report from St. Elizabeths.[20] But Gilliam's counsel did not dispute the hospital's finding that Gilliam had attained competence, and he never asked for a hearing at which to contest it. While the IDCCA does say the court "shall" hold a hearing, the procedure may be modified with the parties' consent. Where (as here) neither party objects, we believe "the court, without holding a hearing, may enter an order adjudicating the defendant to be competent based upon the

---

16. Gilliam was discharged from St. Elizabeths and returned to the D.C. Jail twelve days after the jury returned its verdict.

17. The judge ordered this post-trial competency evaluation on February 1, 2008, after being apprised that Gilliam had become withdrawn and depressed at the Jail.

18. *See Boyd v. United States*, 586 A.2d 670, 674–75 (D.C.1991).

19. *See Howard v. United States*, 954 A.2d 415, 419 (D.C.2008) ("Concededly, due to appellant's decision not to communicate, he may

not have 'rationally consulted with his attorney' and thus may have been less likely to 'factually understand the nature of the proceedings against him,' but the test for competency hinges solely upon whether there was a 'sufficient present *ability*' to do so." (internal citation omitted)).

20. *See* D.C.Code § 24–531.06(a) (stating that the court "shall" hold a hearing to make a new finding as to the defendant's competence).

certification of the examining psychiatrist."[21]

By the time of trial, there was no longer a substantial doubt as to Gilliam's competence. The judge's finding that he was competent to stand trial was supported by the evidence of record. We will not disturb it.

### III. Severance of Defendants

■ "When two or more defendants are charged with jointly committing a criminal offense, there is a strong presumption that they will be tried together."[22] Even so, under Superior Court Criminal Rule 14, the court may sever a defendant's case from his co-defendants' cases if it appears the defendant will be prejudiced by the joinder. Appellants Gilliam and Hargraves each moved for severance prior to trial, claiming they would be prejudiced in a joint trial by conflicts in the defenses and, in Hargraves's case, by the disparity between the minimal evidence against him and the disproportionately greater evidence of his co-defendants' guilt. The trial judge denied these motions, which appellants renewed without success during trial. They now contend that we must reverse their convictions because the judge should have granted them separate trials. We review the judge's rulings for abuse of discretion and will reverse only if Gilliam or Hargraves shows he suffered "manifest prejudice" as a result of being tried jointly.[23]

■ To show they were prejudiced by the assertion of allegedly antagonistic defenses, appellants point primarily to the testimony of their co-defendant English. As outlined above, English's defense at trial was self-defense: Denying the government's claim that the defendants carried out a planned attack on Beckham, he testified that Beckham was actually the aggressor and that he (English) fought back and killed Beckham only to protect himself. Although English's defense thus largely *exculpated* Gilliam and Hargraves, they argue that in certain respects his testimony was inconsistent with their defenses of innocent presence.

■■ In actuality, the arguably inconsistent testimony was, at most, cumulative of substantial other evidence and scarcely damaging to Gilliam and Hargraves; it did not add to the prosecution case against them or materially undercut their defenses. But even if that were not so—and even if we were not to believe that English's defense substantially benefited his co-defendants as well as himself—we have a more fundamental reason to reject the claim that antagonistic defenses caused Gilliam and Hargraves manifest prejudice. It is well-settled that "[m]utually antagonistic defenses are not prejudicial *per se*,"[24] and "[t]he mere fact that ... co-defendants' defenses are separate, distinct and antagonistic and that each may have a better chance at acquittal if tried separately is not sufficient for a grant of severance."[25] In general, "a [trial] court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of

**21.** *Bennett v. United States*, 400 A.2d 322, 325 (D.C.1979).

**22.** *King v. United States*, 550 A.2d 348, 352 (D.C.1988) (citation omitted).

**23.** *Roy v. United States*, 871 A.2d 498, 503 (D.C.2005).

**24.** *Zafiro v. United States*, 506 U.S. 534, 538, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *see also Ingram v. United States*, 592 A.2d 992, 996 (D.C.1991) ("Unfair prejudice does not arise merely because defendants are mutually hostile and attempt to blame each other.").

**25.** *Roy*, 871 A.2d at 504.

one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." [26]

Gilliam and Hargraves do not identify any specific trial right that was compromised by the denial of their severance motions or any reason to suppose the jury was disabled from fairly adjudicating their guilt. The admission of any supposedly damaging testimony from English was not *unfairly* prejudicial to either co-defendant as English testified under oath and was subject to cross-examination like every other witness. As the Supreme Court explained in *Zafiro,*

> a fair trial does not include the right to exclude relevant and competent evidence. A defendant normally would not be entitled to exclude the testimony of a former codefendant if the [trial] court did sever their trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant.[27]

Moreover, prejudice is not shown merely by the hypothetical possibility that the jury could have ignored the judge's burden-of-proof and other instructions and in-

ferred a defendant's guilt just from the fact that there were conflicting defenses.[28] We see no sign of that in this case. The verdict the jury actually rendered defeats such a speculation—for in addition to *acquitting* appellants of the most serious charges against them, the jury differentiated Hargraves from his co-defendants by finding him guilty of only one, comparatively minor, count.[29]

▮▮▮▮ Hargraves's further argument, that he was prejudiced because the evidence against his co-defendants was much stronger than the evidence against him, is also unpersuasive. Here, too, Hargraves fails to show that the disparity in the weight of the evidence compromised a specific trial right or prevented the jury from reliably determining his guilt or innocence. "A defendant is not entitled to severance merely because the evidence against a co-defendant is more damaging than the evidence against him." [30] To be sure, we have recognized that in some cases "where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his codefendants," there may be a spillover effect.[31] In such cases the inquiry is

---

**26.** *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933; accord, *Moore v. United States,* 927 A.2d 1040, 1056 (D.C.2007).

**27.** *Zafiro,* 506 U.S. at 540, 113 S.Ct. 933.

**28.** *See id.* at 540–41, 113 S.Ct. 933.

**29.** Some decisions of this court have said that "[t]he prejudice resulting from irreconcilable defenses is overcome if there would be available at trial enough independent evidence of [the defendant's] guilt—*beyond that required for the government to survive a motion for judgment of acquittal*—so that the court reasonably could find, with substantial certainty, that the conflict in defenses alone would not sway the jury to find [the defendant] guilty." *Ingram,* 592 A.2d at 997 (internal quotation marks and citation omitted). A sufficient-

independent-evidence requirement is questionable in light of *Zafiro* (which made no mention of such a condition), but we need not discuss its continuing vitality in this case. The government unquestionably presented sufficient evidence of each appellant's guilt beyond that required to survive a motion for judgment of acquittal.

**30.** *Christian v. United States,* 394 A.2d 1, 21 (D.C.1978).

**31.** *Id.; cf. Zafiro,* 506 U.S. at 539, 113 S.Ct. 933 ("[E]vidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.").

"whether the evidence presented [was] so complex or confusing that the jury would [have been] unable to ... make individual determinations about the guilt or innocence of each defendant."[32]

Because he was not convicted of the same offenses as his co-defendants, we have no concern that a spillover effect prejudiced Hargraves. In finding Hargraves guilty only of fleeing, the jury demonstrated that it made an individual determination of his guilt based on the evidence (which was certainly not *de minimis*) that *he* drove the SUV from the scene of the shooting. The jury clearly did not find Hargraves guilty of anything based on the evidence of his co-defendants' greater culpability.

## IV. Ruling on the Order of Proof

Appellant English called six witnesses at trial to testify about Beckham's violent reputation and behavior and the threat he posed to English's life. Four of these witnesses testified about murders, shootings, and other acts of violence Beckham had committed and about threats he had made to kill appellant Hargraves and others. A fifth witness attested to Beckham's reputation in the community as a violent, volatile, and dangerous individual. And the sixth witness, one of English's neighbors, testified that she saw Beckham waiting outside English's house with a gun in his hand on the night before he was killed.[33]

The trial judge allowed English to present this evidence of Beckham's violent character because it was relevant to his claim that he killed Beckham in self-defense.[34] But the judge ruled that English first had to lay the predicate for its admission by presenting some evidence that he had acted in self-defense. As a practical matter, this ruling made it necessary for English to take the stand and explain his actions to the jury before, rather than after, the jury heard the other defense witnesses' testimony about Beckham's reputation and violent acts. Claiming that the ruling thereby impaired the persuasiveness of his testimony, English contends the judge abused his discretion and infringed his constitutional rights to the effective assistance of counsel and to present a defense.

The issue arose when, prior to the start of the defense case, the prosecutor requested that the anticipated evidence of Beckham's prior bad acts not be admitted ahead of evidence of self-defense. English's counsel objected, stating:

> I would not put on bad acts evidence if I didn't believe that I could put on evidence of self-defense ... but I don't want to put on that evidence first. I want to end with that evidence. So I want to put on my witnesses ... in a way that I think tells the story.

English's counsel did not say what the evidence of self-defense would be, but she did not disagree when the judge surmised that it likely would have to come from English's own mouth.[35] If so, the prosecu-

---

**32.** *Johnson v. United States*, 596 A.2d 980, 987 (D.C.1991) (quoting *Payne v. United States*, 516 A.2d 484, 490 (D.C.1986)).

**33.** English himself testified that he was aware of Beckham's murderous reputation and believed that Beckham intended to kill him and others in the neighborhood. He said his neighbor had told him about seeing Beckham lurking outside his house.

**34.** The evidence bore on who was the first aggressor and the reasonableness of English's fear of Beckham. *See Hart v. United States*, 863 A.2d 866, 870–71 (D.C.2004).

**35.** Although English's counsel had previewed his defense in her opening statement, she had not said that English would testify.

tor argued, the government's case would be prejudiced if English were to choose not to take the stand after the jury had heard about Beckham's history of violence. Nonetheless, saying he could strike the bad act evidence if English failed to testify as his counsel expected, the judge declined to require him to put on evidence of self-defense ahead of any testimony concerning Beckham's violent conduct and reputation.

After a break, however, the judge revisited the issue and reversed his ruling. As the judge explained, he had concluded that the prosecutor was right about the potential for unfair prejudice, and he saw no reason the jury needed to hear testimony about the decedent's propensity for violence before the predicate evidence of self-defense was introduced:

> I think [the prosecutor's] right ... that he's prejudiced.... [b]ecause I can't control what you put on. If you say you [are] going to put it on, then put it on.... [W]hy should you not be forced to put the predicate evidence on before you start dragging [Beckham's] name through the mud in my expression? I don't care how you put it on, but I think you [have] got to put something on [supporting English's claim of self-defense].

English's counsel urged the judge to adhere to his earlier view that if, "for some reason," she did not present evidence of self-defense, a sufficient remedy would be to strike all the testimony about Beckham's history of violence. However, counsel did not answer the judge's question as to why she should not be required to introduce some evidence of self-defense first.

■■■ On appeal, English agrees, as he must, that the trial judge "may determine generally the order in which parties will adduce proof [and that] his determination will be reviewed only for abuse of discretion."[36] This discretion extends to rulings on the conditional admissibility of evidence dependent for its relevance on the proof of other facts. Federal Rule of Evidence 104(b) states the general rule courts follow:

> When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court *may* admit the proposed evidence on the condition that the proof be introduced later. (Emphasis added.)

For convenience and other practical reasons, and in recognition of "the need for leeway so counsel may select the most persuasive order of proof,"[37] judges routinely do allow evidence to be admitted provisionally "on the proponent's express or implied assurance that she will 'connect up' the tendered evidence by proving the missing facts later."[38] Of course, such assurances should not be given or accepted "without a good faith and objectively reasonable belief that the missing links will in fact be supplied."[39] But even where adequate assurances are provided, a trial judge has discretion "to avoid prejudice or confusion, [to] require that the missing fact be proved first."[40]

---

**36.** *Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *see also Huddleston v. United States,* 485 U.S. 681, 690, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) ("The trial court has traditionally exercised the broadest sort of discretion in controlling the order of proof at trial, and we see nothing in the Rules of Evidence that would change this practice.").

**37.** *United States v. Cote,* 744 F.2d 913, 916 (2d Cir.1984).

**38.** McCormick on Evidence § 58 (6th ed.2006).

**39.** *Cote,* 744 F.2d at 916.

**40.** McCormick on Evidence § 58; *see, e.g., United States v. Singh,* 811 F.2d 758, 762 (2d Cir.1987) (holding that the trial judge acted within his discretion in refusing to accept

English argues not that the trial judge lacked discretion to rule on the order of proof, but that the judge failed to exercise that discretion in this instance. According to English, the judge "refused to admit the prior bad act evidence until after the defense counsel presented affirmative evidence of self-defense because he [erroneously] believed it was an ironclad rule that the predicate be admitted first."[41] Invoking the principle that "[f]ailure to exercise choice in a situation calling for choice is an abuse of discretion—whether the cause is ignorance of the right to exercise choice or mere intransigence—because it assumes the existence of a rule that admits of but one answer to the question presented,"[42] English asserts that the judge's erroneous ruling arbitrarily infringed his right to the unfettered assistance of counsel[43] and his right to put on a defense.[44]

We reject the premise of English's claim. In our view the record affirmatively shows that the trial judge did not labor under any misapprehension that an "ironclad rule" governed his decision. On the contrary, the judge was aware of his discretionary authority and exercised it. He considered allowing English to introduce the evidence of Beckham's violent acts conditionally, recognizing that he could strike the evidence if need be. Ultimately, however, the judge found that English's preference was outweighed by the risk of unfair prejudice to the government from the admission of evidence powerfully besmirching the decedent's character in the event English failed to present evidence that he acted in self-defense—prejudice that would not necessarily be dispelled by the remedy of formally striking the prior bad act evidence and instructing the jury to disregard it.[45]

We are equally unpersuaded by English's backup argument, advanced in his reply brief, that if the judge did exercise discretion, he abused it by failing to consider all the appropriate factors in making his ruling.[46] It is undeniable that potential

---

proffered testimony unless and until the defendant had testified and established the proper foundation for its admission); *see also Harris v. Barkley*, 202 F.3d 169, 174 (2d Cir. 2000) (no constitutional error in ruling that the defendant would have to testify before the witness whose appearance was delayed).

41. Brief for Appellant English at 5.

42. *Johnson v. United States*, 398 A.2d 354, 363 (D.C.1979).

43. *Cf. Brooks v. Tennessee*, 406 U.S. 605, 612–13, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) (holding, *inter alia*, that a state statute requiring the defendant in a criminal trial to testify before any other defense witnesses or not at all unconstitutionally deprived the accused of his lawyer's assistance at a critical stage of the proceeding; adding, however, that "nothing we say here otherwise curtails in any way the ordinary power of a trial judge to set the order of proof").

44. *See, e.g., Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d

503 (2006) ("This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." (internal quotation marks and brackets omitted)).

45. *Cf. Cote*, 744 F.2d at 916–17 (reversing the defendant's conviction because the jury was exposed to highly prejudicial other crimes evidence based on the government's unfulfilled commitment to connect it up and the trial judge's "cautionary instructions [to disregard the other crimes evidence] could not adequately protect the defendant's right to consideration of his guilt by a jury uninfluenced by extraneous matters").

46. *See Johnson*, 398 A.2d at 365 ("The court reviewing the decision for an abuse of discretion must determine 'whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion.'" (citation omitted)).

prejudice to the opposing party is an appropriate factor to consider, as is the possibility that the proponent of the conditionally relevant evidence may fail to offer the proof necessary to support its admission. The judge explicitly considered those factors. Moreover, contrary to English's claim, we see no reason to think the judge either ignored or doubted defense counsel's reasonable, good faith belief that she would present evidence of self-defense. In fact, the judge told the prosecutor at one point that he could "take [the defense] proffer that this is going to happen," implying that he deemed counsel's representation to be reasonable and offered in good faith. The judge simply took into account that, despite counsel's assurances, English ultimately could choose not to take the stand to provide the necessary evidence. English argues the judge should have considered that it was highly unlikely he would make that choice. But his trial counsel did not make such a claim—she never even said English was going to testify. Not being privy to English's defense calculations and strategy, the judge could not be sure he would take the stand; defendants often decide whether to testify only at the last minute after evaluating how the trial has gone and whether other defense evidence has made an impact.[47] We think it was entirely reasonable for the judge to recognize the uncertainties and entertain the prospect that English would elect not to take the stand without trying to predict how likely or unlikely it was that he would do so.

English also complains that the judge failed to consider how critical it was to his defense for the jury to hear eyewitnesses tell of Beckham's violent history and the threat he posed *before* it heard English tell why he shot Beckham. Citing psychological studies of how juries decide cases, English argues that evidence presented in chronological or narrative sequence is more persuasive than the same evidence presented out of order because jurors construct stories to explain the evidence as it comes in and tend to disregard subsequent evidence that conflicts with those stories.[48] Therefore, English claims, the jury would have been more receptive to his explanation for shooting Beckham had it heard the eyewitness accounts of Beckham's violence before he took the stand; the jury supposedly would have been "better able to evaluate the reasonableness of [his] beliefs in context and ... much more likely to construct a narrative consistent with self-defense."[49]

We need not address the soundness of the psychological research on which English relies or the likelihood that the order of proof made the kind of difference that English posits. We do not doubt that, in deciding whether to admit evidence conditionally, a trial judge should consider the proponent's legitimate reasons for wanting to do so, including counsel's view that it represents the most persuasive way to present his case (though the judge ultimately may find those reasons outweighed

**47.** As the Court recognized in *Brooks*, "a defendant may not know at the close of the State's case whether his own testimony will be necessary or even helpful to his cause. Rather than risk the dangers of taking the stand, he might prefer to remain silent at that point, putting off his testimony until its value can be realistically assessed." 406 U.S. at 610, 92 S.Ct. 1891. In the present case, counsel's expressed desire to "end with" the evidence of self-defense would have enabled English to defer a final decision as long as possible in order to make that assessment.

**48.** *See, e.g.,* Nancy Pennington & Reid Hastie, *A Cognitive Theory of Juror Decision Making: The Story Model,* 13 Cardozo L.Rev. 519 (1991).

**49.** Reply Brief for Appellant English at 12.

by the risk of prejudice to the opposing party or other considerations). But if the judge in this case did not weigh how important English's preferred order of proof was to his defense, it was because English never told him it was important, or if so why. Although defense counsel did say that she "want[ed] to put on [her] witnesses ... in a way that ... tells the story," that was all she said on the subject. She did not explain the significance she attached to presenting the evidence in chronological or story order or identify any respect in which English's defense could be prejudiced by the judge's ruling. (Nor, parenthetically, did she assert that English's constitutional rights were at stake.) When the judge later asked English's counsel directly why she should be excused from laying the necessary evidentiary predicate before she presented the prior bad act evidence, she did not answer the judge's inquiry. We cannot fault the judge for failing to intuit and weigh defense counsel's unarticulated belief, divulged for the first time on appeal, that the jury needed to hear the evidence of Beckham's violent character before English took the stand in order to evaluate his testimony and the reasonableness of his actions in context and construct a narrative consistent with self-defense.

In short, English gave the trial judge no affirmative reason to allow him to present the prior bad act evidence "out of order," i.e., without first satisfying the conditions under which that evidence would be relevant and admissible. The judge did not err in failing to consider reasons that English never offered. We hold that the judge did not abuse his discretionary authority over the order of proof by requiring English to present some evidence that he acted in self-defense before he could introduce the evidence of the decedent's propensity for violence.

## V. Conclusion

For the foregoing reasons, we affirm appellants' convictions. English and Gilliam each argue that one of his PFCV convictions should be vacated on merger grounds. We agree and direct the trial court to effectuate the vacaturs on remand.[50]

*So ordered.*

Concurring opinion by Senior Judge NEWMAN at page 34.

NEWMAN, Senior Judge, concurring[1]:

Having authored what is viewed by some as the leading opinion by this court on the issue of judicial discretion, *see*

---

50. English and Gilliam were convicted of two counts of PFCV based upon the two predicate offenses of the voluntary manslaughter of Beckham and the ADW on Tia Davis (who was in the Thunderbird along with Beckham when shots were fired at it, though she was not injured). The sentences imposed on the PFCV counts run concurrently with each other for each appellant, so merger of the PFCV convictions is something of an academic question. But viewing the evidence in light of the verdict, which implies the jury found each appellant to have acted in imperfect self-defense, we think it fair to apply the principle that "multiple PFCV convictions will merge, even if the predicate felony offenses do not merge, if they arise out of [each] defendant's

uninterrupted possession of a single weapon during a single act of violence." *Matthews v. United States*, 892 A.2d 1100, 1106 (D.C. 2006). Although the predicate offenses "were not wholly simultaneous, they were nearly so," *id.* at 1107, and we are not prepared to say that English or Gilliam came to a "fork in the road" or acted on a "fresh impulse" in the course of committing them. *See id.* at 1106. That the predicate offenses had different victims does not preclude merger on the facts of this case. *See, e.g., Hampleton v. United States*, 10 A.3d 137, 146 (D.C.2010).

1. Judges Glickman and Fisher join in this concurrence.

*Johnson v. United States*, 398 A.2d 354 (D.C.1979), and having written often on the issue of our measure of appellate review, *see, e.g., Davis v. United States*, 564 A.2d 31 (D.C.1989) (en banc); *United States v. Felder*, 548 A.2d 57 (D.C.1988), and most recently in *Porter v. United States*, 37 A.3d 251, 268 (D.C.2012) (Newman, J., dissenting), I am constrained to pen a word on the issue of our measure of review, in addition to joining the court's opinion.

The court's opinion correctly cites our various prior holdings on our measure of review of a trial court's finding that the defendant is competent. We have said our review is of a ruling made by a trial court vested with "wide discretion" in determining competence to stand trial. *Holmes v. United States*, 407 A.2d 705, 706 (D.C. 1979) (citing *Clyburn v. United States*, 381 A.2d 260 (D.C.1977) *cert. denied*, 435 U.S. 999, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978)). On other occasions we have said competency determinations are discretionary rulings not to be set aside unless "clearly arbitrary or erroneous." *Bennett v. United States*, 400 A.2d 322, 325 (D.C.1979). We expounded further on *Bennett* in *Wallace v. United States*, 936 A.2d 757, 763 n. 11 (D.C.2007), where we said:

> "A finding of competency will not be set aside upon review unless it is clearly arbitrary or erroneous." *Bennett*, 400 A.2d at 325 (internal quotation marks and citation omitted). The "clearly erroneous" standard applies because a trial court's competency determination is

largely a factual determination, *see United States v. Izquierdo*, 448 F.3d 1269, 1278 (11th Cir.2006) ("A [trial] court's competency determination is primarily factual in nature.") and *United States v. Villegas*, 899 F.2d 1324, 1341 (2d Cir.1990) ("A defendant's competence to stand trial is a question of fact. . . ."), which must be accorded "great deference." *Bennett*, 400 A.2d at 325.

I respectfully submit that our review is neither of a determination committed to the discretion of the trial court, *see Johnson, supra*, 398 A.2d 354, nor a finding of fact subject to review by us pursuant to D.C.Code § 17–305(a) (when tried by the court, "the judgment may not be set aside except for errors of law" or unless "the judgment is plainly wrong or without evidence to support it."). Rather, the issue being reviewed is a mixed question of law and fact as elucidated, among other places, in *Davis, supra*, 564 A.2d 31 and *Felder, supra*, 548 A.2d 57. This court should so recognize and review competency determinations as such pursuant to the strictures of *Davis*.[2] I recognize, however, that we as a division cannot do so in the face of our precedents, flawed though I submit they are.

---

**2.** The trial court is, of course, vested with discretion in the *procedure* it utilizes to comply with the mandate of the Incompetent Defendants Criminal Commitment Act. *See, e.g., Clyburn, supra.*