*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 16-CF-1068 & 16-CF-1098

DEANGELO PARKER & DELONTA Q. ROLLERSON, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(2015-CF3-015573 & 2015-CF3-015572)

(Hon. Anita Josey-Herring, Trial Judge)

(Argued November 6, 2019                          Decided April 17, 2025)

*Cecily E. Baskir* for appellant Parker.

*Thomas D. Engle*, with whom *Sharon L. Burka* was on the brief, for appellant Rollerson.

*Patricia Heffernan*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, *Elizabeth Trosman*, *John P. Mannarino*, *Jennifer Fischer*, and *Thomas Saunders*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, *Associate Judge*, THOMPSON,[*] *Senior Judge*, and EPSTEIN,[**] *Senior Judge, Superior Court of the District of Columbia.*

Opinion for the Court by *Senior Judge* EPSTEIN, Superior Court of the District of Columbia.

Dissenting opinion by *Associate Judge* BECKWITH at page 48.

EPSTEIN, *Senior Judge, Superior Court of the District of Columbia*: A jury found appellants DeAngelo Parker and Delonta Q. Rollerson, along with their co-defendant Maurice Ricks, guilty of armed robbery and related gun possession charges.[1]  On appeal, Mr. Parker and Mr. Rollerson raise challenges to investigative stops, show-up identifications, and the trial court's denial of severance motions, management of a witness's testimony, and response to a question by the jury. Applying established legal principles to the facts of this case, we affirm.

## I.  Background

On November 8, 2015, at approximately 3:30 a.m. near the intersection of 55th Street and Eastern Avenue in Northeast D.C., two men, one armed with a

---

[*] Senior Judge Thompson was an Associate Judge of the court at the time of submission.  On February 18, 2022, she began her service as a Senior Judge.

[**] Sitting by designation pursuant to D.C. Code § 11-707(a).  Senior Judge Epstein was an Associate Judge of the Superior Court at the time of submission.  On February 24, 2025, he began his service as a Senior Judge.

[1] D.C. Code §§ 22-2801, -4502, -4504(b).

shotgun, approached Charmagne Eccles, one hit her in the face, and they stole two iPhones. The two men started to leave but immediately returned. The gunman threatened to kill Ms. Eccles with his shotgun, the gunman and she struggled, the shotgun discharged, and Ms. Eccles got possession of the weapon. The two men ran off, but returned with a third man and asked Ms. Eccles to return the shotgun. Ms. Eccles ran into the street and flagged down a police vehicle, and the three men ran away.

When Detective Thomas O'Donnell arrived at the scene shortly after the robbery, he used an application on an iPhone to track Ms. Eccles's stolen iPhones. The application led officers to the 5400 block of James Place, where they apprehended Mr. Ricks after he attempted to flee. The police found Ms. Eccles's phones in Mr. Ricks's pocket, and they arrested him.

The police established a perimeter around a city block near the robbery. Officers searched for the two remaining suspects with the help of a K-9 unit and a police helicopter. Around 5:15 a.m., a police dog made contact with two men ducked down behind shrubs in a backyard inside the perimeter. The two men were later identified as Mr. Parker and Mr. Rollerson. In show-up identifications, Ms. Eccles identified Mr. Parker and Mr. Rollerson as two participants in the robbery.

All three defendants were charged with armed robbery and possession of a firearm during the commission of a crime of violence (PFCV), and Mr. Ricks was also charged with assault with intent to kill (AWIK).

Mr. Parker, Mr. Rollerson, and Mr. Ricks filed pretrial motions to suppress, arguing that the police stopped them without reasonable suspicion that they were participants in the robbery, and that evidence obtained as a result of the illegal stops should be suppressed. After a pretrial evidentiary hearing, the trial court concluded that the officers had reasonable suspicion for each stop.

Mr. Parker and Mr. Rollerson filed pretrial motions to suppress Ms. Eccles's out-of-court identifications. After a pretrial evidentiary hearing, the trial court denied the motions, finding that the show-up identification procedure was not unduly suggestive and that the identifications were reliable.

Mr. Parker and Mr. Rollerson filed motions to sever their trial from Mr. Ricks's, arguing that Mr. Ricks would present a conflicting defense and become a second prosecutor. The trial court denied the motion. During the trial, Mr. Parker and Mr. Rollerson renewed their severance motions, and the trial court again denied their request.

The government called Ms. Eccles as a witness on April 28. Over defense objections, the trial court delayed her cross-examination until she got federal

immunity because the defense intended to question her about violations of federal criminal law in multiple jurisdictions. Ms. Eccles got this immunity on the next trial day, which was May 2. Her cross-examination began May 10, which was two trial days later.

During its deliberations, the jury sent a note asking whether it could convict Mr. Ricks of AWIK on an aiding and abetting theory if the possibility that Mr. Rollerson was the gunman created a reasonable doubt that Mr. Ricks was the gunman. Only Mr. Ricks was charged with AWIK, and the government argued to the jury that Mr. Ricks himself assaulted Ms. Eccles with the gun, not that he aided and abetted a co-defendant. Rejecting Mr. Rollerson's proposal to address the robbery charge in its answer, the trial court told the jury that it could convict Mr. Ricks of AWIK only if the government proved beyond a reasonable doubt that he was the gunman who tried to kill Ms. Eccles. Mr. Rollerson moved for a mistrial, and the trial court denied the motion.

The jury convicted each defendant of armed robbery and PFCV. The jury could not reach a verdict on the AWIK charge against Mr. Ricks.

Mr. Parker and Mr. Rollerson filed timely appeals.[2] Pursuant to D.C. App. R. 28(j), Mr. Rollerson adopted Mr. Parker's arguments concerning the stops, the out-of-court identifications, severance, and Ms. Eccles's cross-examination.

## II.     Reasonable Suspicion

Mr. Parker and Mr. Rollerson argue that the trial court erred in denying their motions to suppress because the facts described in the testimony at the pretrial hearing did not establish reasonable suspicion for the investigatory stops. The government does not dispute that both men were stopped shortly after the police spotted them,[3] but it argues that these stops were justified in order to give Ms. Eccles a chance to see whether or not she could identify them as participants in the robbery. We conclude that the evidence presented by the government established that the police had reason to suspect that the two men found hiding in a dark backyard inside

---

[2] At Mr. Ricks's request, this court dismissed his appeal.

[3] Case law from other jurisdictions supports the conclusion that Mr. Parker was seized when the police dog, released by the officers, used the physical force of his bite to stop him. *See, e.g.*, *Vathekan v. Prince George's County*, 154 F.3d 173, 178 (4th Cir. 1998) (holding that plaintiff was seized when police dog was deployed "to find, bite, and detain" potential burglary suspect); *Collins v. Schmidt*, 326 F. Supp. 3d 733, 741 (D. Minn. 2018) (holding that police dog's act of biting plaintiff on the arm and leg constituted a Fourth Amendment seizure); *McKay v. City of Hayward*, 949 F. Supp. 2d 971, 979 (N.D. Cal. 2013) (concluding that a bystander was seized when he was bitten by a police dog that a police officer searching for a robbery suspect intentionally deployed in his yard).

a police perimeter around 5 a.m. were the two remaining suspects. Because the stops were justified by reasonable suspicion, the subsequent show-up identifications were not the product of unconstitutional seizures.

### A. Evidence at the Suppression Hearing

At the hearing on the motions to suppress evidence obtained as a result of the stops of each of the three defendants, the government called as its sole witness Detective Darin Booher. Detective Booher was not present at the scene on the night of the robbery, and he based his testimony on what Detective O'Donnell told him and on police paperwork. Detective O'Donnell was present when Mr. Ricks was stopped, but not when Mr. Rollerson and Mr. Parker were stopped by other officers. Detective Booher did not speak directly with any other officers who were at the scene, and he did not listen to the police radio broadcasts.

Detective Booher testified that the robbery occurred around 3:37 a.m., marked units and uniformed officers arrived within minutes, and officers stopped Mr. Ricks approximately ten minutes after the robbery.

Detective Booher testified that the police established a perimeter around the block bounded by James Place, Hunt Avenue, 55th Street, and Eastern Avenue. He testified that the police used the Find My iPhone application to construct this rectangle.

Detective Booher testified that after the police apprehended Mr. Ricks, a K-9 dog unit and a police helicopter joined in the search for the two remaining suspects. He said that police first spotted Mr. Parker and Mr. Rollerson when "[t]hey were ducked down behind home [sic] shrubs in the back yard of a residence" inside the perimeter. Detective Booher testified that he believed that Mr. Parker and Mr. Rollerson were apprehended within two blocks of the robbery, although he did not know the exact location.

Detective Booher testified that a police dog tracked to a location where Mr. Parker attempted to flee. Detective Booher "remember[ed] [D]etective O'Donnell specifying that [Mr. Rollerson] tried to jump over a fence" after the dog was released and "either got tripped up or was apprehended immediately on the other side of the fence." Detective Booher did not know whether the officers made any announcements or gave any warnings before releasing the dog, although he said it would have been standard procedure to do so.

After Mr. Parker and Mr. Rollerson were stopped in the backyard, the police conducted a show-up identification, and Ms. Eccles identified each of them about an hour and 45 minutes after the robbery.

## B.    Legal Principles

In reviewing the trial court's denial of a motion to suppress, we evaluate legal conclusions *de novo* and "make an independent legal assessment as to whether" a detention was supported by reasonable suspicion. *Umanzor v. United States*, 803 A.2d 983, 991 (D.C. 2002). Looking at the record in the light most favorable to the court's ruling, *Mayo v. United States*, 315 A.3d 606, 617-18 (D.C. 2024) (en banc), we "leave untouched factual findings so long as they are not clearly erroneous." *Jenkins v. United States*, 152 A.3d 585, 589-90 (D.C. 2017). "The 'clearly erroneous' standard of review is highly constraining," although "it does not relieve us of our obligation to conscientiously review the trial court's finding based on the record presented." *Hawkins v. United States*, 248 A.3d 125, 130 (D.C. 2021) (quotation and citation omitted).

One exception to the Fourth Amendment's warrant requirement is that "the police may briefly detain a person for an investigatory or *Terry* stop, even if they lack probable cause, if the officers have a reasonable suspicion based on specific and articulable facts that the person has just committed a crime." *Bennett v. United States*, 26 A.3d 745, 751 (D.C. 2011) (quotation and citation omitted); *see Terry v. Ohio*, 392 U.S. 1 (1968). The government has the burden to establish the legality of

a warrantless stop. *See Davis v. United States*, 306 A.3d 89, 98 (D.C. 2023); *Akinmboni v. United States*, 126 A.3d 694, 697 (D.C. 2015).

In assessing whether officers had particularized reasonable suspicion, we examine the "the totality of 'the facts available to the officer at the moment of the seizure'" to determine whether they would "'warrant a [person] of reasonable caution in the belief' that [the stop] was appropriate." *Mayo*, 315 A.3d at 620 (quoting *Terry*, 392 U.S. at 21-22). "*Terry*'s reasonable articulable suspicion standard requires … considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Mayo*, 315 A.3d at 620 (quotation and citation omitted). "However, the officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch," and "he must provide some minimal level of objective justification for making the stop." *Goines v. United States*, 964 A.2d 141, 144 (D.C. 2009) (quotation and citation omitted); *Bennett*, 26 A.3d at 751 (an articulable suspicion is "more than a mere 'hunch' or 'gut feeling'") (quotation and citation omitted).

"In considering whether reasonable articulable suspicion existed, we must consider the totality of the circumstances, as viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Posey v. United States*, 201 A.3d 1198, 1201 (D.C. 2019) (quotation and citation

omitted); *see Green v. United States*, 974 A.2d 248, 256 (D.C. 2009). "[I]n evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). "Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *see United States v. Taylor*, 49 A.3d 818, 825 (D.C. 2012) ("common sense conclusions about human behavior may contribute to reasonable suspicion") (quotation and citation omitted).

"Multiple factors may contribute to the totality of the circumstances, including the time of day, flight, the high crime nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and viewing of an object or bulge indicating a weapon." *Posey*, 201 A.3d at 1201-02 (quotation and citation omitted); *Armstrong v. United States*, 164 A.3d 102, 110-11 (D.C. 2017) (explaining that factors relevant to the totality of the circumstances include spatial and temporal proximity to the crime, the number of people in the area, the time of day, and whether the suspect fled from the police). The issue is not whether any one factor individually justifies a stop, but rather whether "collectively" the totality of the circumstances supports a determination that the officers had reasonable suspicion for an investigatory stop. *Mayo*, 315 A.3d at 637.

To have reasonable suspicion, officers "need not rule out the possibility of innocent conduct." *Mitchell v. United States*, 314 A.3d 1144, 1151 (D.C. 2024) (quotation and citation omitted). "[T]he police need not rule out every innocent explanation for suspicious behavior in order to justify an investigatory stop." *Pridgen v. United States*, 134 A.3d 297, 304 n.20 (D.C. 2016) (quotation and citation omitted). "[I]nnocent individual acts or circumstances do not rule out a finding of reasonable suspicion," and "the *Terry* standard does not require that an officer rule out the possibility of innocent behavior, for suspicious conduct by its very nature is ambiguous, and the principal function of the investigative stop is to quickly resolve that ambiguity." *Umanzor*, 803 A.2d at 993 (quotation and citation omitted). "[S]imply because certain conduct may be construed as consistent with innocent behavior does not mean that this conduct may not form the basis for reasonable suspicion." *Gomez v. United States*, 597 A.2d 884, 890 (D.C. 1991) (quotation and citation omitted).

"*Trustworthy* hearsay is admissible in a suppression hearing and may justify a finding of probable cause." *In re K.H.*, 14 A.3d 1087, 1091 (D.C. 2011) (emphasis in original); *see also United States v. Matlock*, 415 U.S. 164, 175 (1974) (holding that there is no automatic rule against the admission of hearsay in an evidentiary hearing on a suppression motion and reversing the trial court's exclusion of reliable hearsay evidence). However, hearsay testimony may be "too unreliable and

uncertain to support" a finding of probable cause or reasonable suspicion. *In re K.H.*, 14 A.3d at 1091.

## C.    Discussion

The facts recounted by Detective Booher made reasonable the police's suspicion that the two men found hiding in a dark backyard inside a police perimeter around 5 a.m. within two hours of an armed robbery were the two suspects still at large. In addition, the trial court could reasonably conclude that Detective Booher's hearsay testimony was reliable.

### 1.    Facts establishing reasonable suspicion

At least four sets of facts support the reasonableness of the suspicion that the two men found in the backyard were two participants in the robbery.

First, the time and place of the stop contribute to reasonable suspicion of Mr. Parker and Mr. Rollerson. Reasonable suspicion is more likely to exist when a person is found at "a time and place where people are not expected to be going about their daily business." *Mitchell*, 314 A.3d at 1153. In *Funderburk v. United States*, 260 A.3d 652, 659 (D.C. 2021), we found particularized suspicion when the police stopped people in an alley at an hour—2:20 a.m. on a December weeknight—when one would not expect to see people engaged in innocent activity there. One would

not expect to see people engaged in innocent activity in a backyard shortly after 5 a.m. In *Umanzor*, we upheld the reasonableness of the stop of a blue two-door Honda carrying three individuals even though the lookout was for a gray two-door Honda containing one or two individuals and the stop occurred 25 minutes after the alleged crime, in part because "[t]he stop of appellant's vehicle was made at approximately 2:45 a.m. —hardly an hour when Hondas of the type described in the lookout are ubiquitous on our city streets." *See* 803 A.2d at 989, 994. Five o'clock in the morning is hardly an hour when people are ubiquitous in our city's backyards in November.[4] Officers are entitled to use their common sense, *see Sharpe*, 470 U.S. at 685, and common sense tells us to suspect that two people at this hour in this location in these circumstances are not there for an innocent reason.[5]

---

[4] "[W]e are wary of over-relying on attempts at case matching" in the fact-specific Fourth Amendment context. *See Mayo*, 315 A.3d at 638. We recognize that *Funderburk* and *Umanzor* are distinguishable in some respects, but they still provide support for our conclusion.

[5] Our dissenting colleague states that shortly after five in the morning, "some early birds might well be taking out the trash, heading out for a run, or walking their dog." We are dubious that many people are engaged in these activities in pitch darkness in their backyards at this time, much less that many pairs of people do so in the same backyard. But in any event, the police can have reasonable suspicion even when a substantial possibility exists that the suspect's conduct has a legitimate explanation. *See Mitchell*, 314 A.3d at 1151; *Pridgen*, 134 A.3d at 304 n.20; *Umanzor*, 803 A.2d at 993; *Gomez*, 597 A.2d at 890.

Second, the police found Mr. Parker and Mr. Rollerson not engaged in innocent activity, but rather hiding by shrubbery, which is suspicious behavior in these circumstances. Detective Booher testified that the two men "were ducked down behind [s]ome shrubs in the back yard of a residence that was contained within" the perimeter.

Third, the existence of the police perimeter made more suspicious the decision of two men to position themselves behind shrubbery in a backyard inside the perimeter. Although the police could not know for sure, it was reasonable for them to suspect that people inside the perimeter were aware that the perimeter existed. Detective Booher testified that the police established a "perimeter" around the block containing the backyard in which Mr. Parker and Mr. Rollerson were found, and the term "perimeter" in this context can only mean that the police positioned themselves around the block. The evidence established that at least some of the police were wearing uniforms and using marked police vehicles.

Although the trial court found that the perimeter area was "secure," Detective Booher's testimony did not establish this fact. However, even if the police allowed a number of people to enter or leave, that would not make any less suspicious the presence of two people hiding in a backyard inside the perimeter for an extended period of time. The police reasonably suspected that two people hiding almost two

hours after the police established the perimeter did so because they were afraid that if they tried to leave the area, the police would see that they matched the description provided by the victim who flagged down a police car as they left the immediate scene of the robbery. In addition, it would not make any sense for a suspect to enter the block in order to hide inside a police perimeter (and indeed it is questionable whether the police could lawfully stop anyone entering—except maybe to warn them that dangerous robbers may be hiding there).

More detailed information about the security of the perimeter and the amount of pedestrian traffic would be relevant if the police had stopped Mr. Parker and Mr. Rollerson when they were walking or standing on the sidewalk or street, but the police did not. Detective Booher could not say that no civilians were out and about inside the perimeter, and in some circumstances, knowing the number of people in the area is important in assessing whether reasonable suspicion exists. *See Armstrong*, 164 A.3d at 111. However, the number of people on streets and sidewalks is irrelevant to whether the police reasonably suspected that two men hiding in a backyard within the perimeter were the missing suspects.

Fourth, the timing of the stops in relation to the armed robbery supports a finding of reasonable suspicion. Close temporal proximity between a crime and a stop may help to establish reasonable suspicion to stop a person near a crime scene,

and conversely, the passage of time after a crime generally weakens any suspicion that people in the area of the crime committed it. *See Mitchell*, 314 A.3d at 1153 (discussing the significance of temporal and geographic proximity for reasonable suspicion); *Funderburk*, 260 A.3d at 660 (finding reasonable suspicion when officers arrived thirty seconds after hearing gunshots); *Hampleton v. United States*, 10 A.3d 137, 144-45 (D.C. 2010) (finding reasonable suspicion where a robbery suspect was spotted a short distance from the robbery scene "ten to fifteen minutes later").

The police stopped Mr. Parker and Mr. Rollerson about an hour and forty-five minutes after the robbery. However, in the circumstances of this case, the passage of substantial time between the crime and the stop tends to strengthen reasonable suspicion. As we have explained, it was reasonable for the police to suspect that people inside the perimeter were aware that the perimeter existed. In addition, the police established the perimeter within two blocks of the robbery minutes after it occurred, and it was reasonable for the police to suspect that anyone hiding inside the perimeter within two hours of the robbery had been hiding there since the perimeter was established.[6] If the suspects had entered a home when the police

---

[6] The lack of testimony about why the police set up this particular perimeter and how secure it was may reduce the level of suspicion about a person hiding in a backyard inside it, but it does not make the suspicion unreasonable, especially since

established the perimeter, they would presumably stay in this place of safety rather than leave the residence and hide in a backyard. After the perimeter was established, it would not make any sense for a suspect to enter the area in order to hide inside the perimeter. In these circumstances, it is reasonable to suspect that two people still hiding almost two hours after the police established the perimeter were doing so because they knew that they were the people the police were looking for.

We do not rely on two factors cited by the trial court, but the absence of these factors does not undermine our conclusion that the police reasonably suspected that the two men in the backyard were the two suspects still at large.

First, we do not rely on any inference that the officers who stopped Mr. Parker and Mr. Rollerson had information about the appearance of the two suspects still at large. This inference may be reasonable, and "[i]n a case concerning a fast-moving sequence of events involving a number of law enforcement officers at several different locations, this court applies the doctrine of collective knowledge in deciding whether police action was justified." *Hampleton*, 10 A.3d at 145 (quotation

---

Detective Booher's testimony established that the perimeter was only one or two blocks away from the crime scene, and Mr. Ricks was stopped in the area within ten minutes after the robbery with the two stolen cellphones. *See Hampleton*, 10 A.3d at 145 (finding reasonable suspicion to stop one robbery suspect when the police had "clear indication" that another suspect had fled across the same area).

and citation omitted). However, Detective Booher testified that he did not know whether the description provided by Ms. Eccles of the three robbers had been broadcast prior to the seizures or when it was broadcast.

Nevertheless, in the circumstances of this case, the officers had reasonable suspicion to stop Mr. Parker and Mr. Rollerson even if they did not have a description of the two remaining suspects. "[T]his court has found reasonable suspicion despite the lack of a description of a suspect" when "the attendant circumstances suggested that the universe of potential suspects was quite small." *See Mitchell*, 314 A.3d at 1153 (quotation and citation omitted). Anyone hiding in a backyard inside a police perimeter in the darkness around 5 a.m. less than two hours after a nearby armed robbery was part of a very small universe of potential suspects, and even if the officers who stopped Mr. Parker and Mr. Rollerson did not have a description, they could reasonably suspect that the two men were the people the perimeter had been established to contain.[7]

Second, the evidence presented at the suppression hearing does not support a reasonable inference that any attempt by Mr. Parker or Mr. Rollerson to flee when the police dog approached evinced consciousness of guilt. The government

---

[7] Detective Booher was not aware of anybody else "hiding around that area" or "stopped in that area."

acknowledges that "simply fleeing an advancing dog is not suspicious." *See Mayo*, 315 A.3d at 626 ("[T]he degree to which flight reasonably gives rise to an inference of consciousness of guilt and thereby contributes to reasonable articulable suspicion depends on context."). However, any attempt at flight by Mr. Parker or Mr. Rollerson is not necessary for reasonable suspicion. They were hiding in a backyard, and it took a police dog to locate and flush them after they successfully eluded detection for over an hour. Even if Mr. Parker and Mr. Rollerson had meekly stood up after the police dog detected them, it would have been reasonable for the police to suspect that they were the two robbers who had eluded capture until then.[8]

To summarize: Mr. Parker and Mr. Rollerson were discovered shortly after 5 a.m. hiding in the darkness in a backyard, the backyard was inside a perimeter that the police had established within two blocks of an armed robbery about ten minutes after the robbery was committed, and the police found the two men not engaged in innocent activity but ducked down behind shrubbery. In these circumstances, the police had not a mere hunch but a reasonable suspicion that the men in the backyard were the two suspects they were looking for. Reasonable suspicion requires less

---

[8] Our dissenting colleague correctly points out that there is no evidence that the dog tracked to Mr. Parker's location based on a crime-relevant scent. What led the dog to that spot, however, is not relevant to reasonable suspicion; the relevant fact is that when the dog found appellants, they were hiding in the backyard around 5 a.m. inside the police perimeter.

than probable cause, *Mayo*, 315 A.3d at 620, and even if the police had not ruled out an innocent explanation for the men's presence in the backyard, the police still had a reasonable suspicion that they were the two elusive suspects. *See Mitchell*, 314 A.3d at 1151; *Pridgen*, 134 A.3d at 304 n.20; *Umanzor*, 803 A.2d at 993; *Gomez*, 597 A.2d at 890.

## 2. Reliable hearsay

Relying heavily on *K.H.*, our dissenting colleague argues that we should reverse because Detective Booher's hearsay testimony was not reliable. *K.H.* establishes that the government must establish that its witness' hearsay testimony is reliably based on someone else's personal knowledge in order to support a finding that police had the requisite basis for a seizure under the Fourth Amendment. *See* 14 A.3d at 1091-92.

As a threshold matter, we note that appellants did not make this reliability argument in the trial court. In the trial court, their argument was that Detective Booher's lack of first-hand knowledge left him unable to provide key information and that the general information he could provide did not suffice to establish reasonable suspicion. Appellants' stated problem was not with what Detective Booher knew but with what he did *not* know, including (1) what the officers who seized appellants knew at the time of the stop, (2) whether the police broadcast a

description of the suspects or what any description was, (3) the exact borders and other details about the perimeter, (4) exactly where Mr. Rollerson was stopped, and (5) facts relating to whether appellants' flight evidenced a consciousness of guilt or only fear of dogs.[9]  However, appellants did not argue that Detective Booher's testimony was unreliable because he did not specify the source of his information or demonstrate his information was ultimately based on first-hand knowledge.  That explains why the trial court did not make explicit findings on this issue.

"[W]e treat a claim as preserved for appeal so long as the judge is fairly apprised as to the question on which she is being asked to rule."  *Medhin v. United States*, 308 A.3d 1242, 1246 (D.C. 2024) (quotation omitted).  "To preserve an issue for appellate review, a party generally must raise the complained-of error in the trial court in a manner that is specific enough to direct the judge's attention to the correct rule of law."  *Evans v. United States*, 304 A.3d 211, 219 (D.C. 2023) (quotation and citation omitted).  Appellants (and Mr. Ricks) did not fairly apprise the trial court of

---

[9] The same is true of appellants' arguments in the trial court concerning the show-up identifications by Ms. Eccles, which was the focus of their arguments. Appellants emphasized that Detective Booher did *not* know (1) how certain Ms. Eccles was about her identifications, (2) how far she was from appellants at the time she identified them, (3) what the lighting conditions were, (4) whether she could hear what was being said in the chatter on police radios at the time of the show-up, and (5) why police conducted a show-up rather than a line-up identification.  In Section III below, we sustain the trial court's denial of the motions to suppress these identifications.

any challenge to the reliability of Detective Booher's testimony. None of the arguments in the trial court quoted by the dissent raised the reliability issue with reasonable specificity, or even hinted that Detective Booher's testimony was so unreliable that it should be stricken.

When a party raises on appeal an argument that it did not make in the trial court, we ordinarily apply a plain error analysis. "Under plain error review, an appellant must show that the objectionable action was (1) error, (2) that is plain, (3) that affects the appellant's substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Medhin*, 308 A.3d at 1247. Here, if the trial court erred in accepting as reliable Detective Booher's testimony about information reported or relayed to him, its error was not clear or obvious.[10]

---

[10] Our dissenting colleague points out that the government's appellate brief does not argue that plain error review applies to the trial court's suppression ruling with respect to the reliability issue. However, the government had no reason to address this issue at all. Just as appellants did not raise this issue in the trial court, they did not raise this issue in their briefs in our court (which helps to explain why they do not cite *K.H.*, the case our dissenting colleague interprets as dispositive). Contrary to the statement in the dissent, we do not misapprehend (seriously or otherwise) the argument in Mr. Parker's briefs. As the portions of the briefs cited in the dissent indicate, appellants argued that the facts described by Detective Booher were insufficiently detailed and complete to establish reasonable suspicion, and they do not apply any word like "unreliable" or "untrustworthy" to his testimony. Ordinarily, we deem any point not urged on appeal to be waived. *See Rose v. United*

Although Detective Booher was not present at the scene, he testified that he got his information from Detective O'Donnell and from police reports, including Detective O'Donnell's initial case resume and an MPD 163 form. Detective Booher relied on information in the police reports about the discovery of appellants; it was just after Detective Booher refreshed his recollection with Detective O'Donnell's initial case summary that he testified that when officers first spotted appellants, they were ducked down behind shrubs in a backyard inside the police perimeter. A police report stated that the police located appellants "hiding in the rear of" a specified home. The defense lawyers did not challenge the reliability of Detective Booher's testimony based on information that could originally have come only from an officer personally involved in appellants' apprehension. Rather than give the trial court reason to question the reliability of information in the police reports on which Detective Booher relied, appellants endorsed the reliability of these reports.[11] Although appellants could have cross-examined Detective Booher about the original

---

*States*, 629 A.2d 526, 535 (D.C. 1993). We nevertheless address the reliability issue because our dissenting colleague does.

[11] Although Detective Booher did not testify about this fact, defense counsel stated as a fact, based on discovery provided by the government, that information from the helicopter about movement inside the perimeter led to the stop.

source of his information about their apprehension in the backyard, they chose not to do so.[12]

Furthermore, Detective Booher's testimony that the two men were ducked down behind shrubs was not rebutted or even impeached. Our dissenting colleague asserts that appellants "had no way to impeach Detective Booher," but appellants had the same impeachment options available to any party against whom hearsay evidence has been admitted. Appellants could have challenged the credibility of Detective Booher, Detective O'Donnell, or any other officer who completed the police reports on which Detective Booher relied and which were available to them.[13] If any police report had contradicted or even failed to support any aspect of Detective Booher's testimony, appellants could have brought out that fact in cross-examination. Detective Booher's only source of information other than police reports was Detective O'Donnell, and appellants could have called Detective

---

[12] Mr. Ricks asked Detective Booher whether Detective O'Donnell saw Mr. Ricks attempt to flee or whether Detective O'Donnell obtained that information from another officer, and Detective Booher testified that Detective O'Donnell personally witnessed Mr. Ricks's attempted flight.

[13] Federal Rule of Evidence 806 permits the credibility of any declarant whose hearsay statement has been admitted in evidence to be attacked by any evidence that would be admissible if the declarant had testified as a witness. We also note that neither appellant testified at the pretrial hearing even though this testimony could not have been used against them at trial except in limited circumstances. *See Simmons v. United States*, 390 U.S. 377, 394 (1968).

O'Donnell (or any other officer present at the scene) as a witness if they had reason to believe that his testimony would undermine Detective Booher's. No evidence suggested that Detective O'Donnell or another officer made up or inaccurately reported the details recounted by Detective Booher in his testimony or included in police reports (which helps to explain why appellants treated the reports as reliable). Although not affirmative evidence of reliability, the lack of contrary evidence and impeachment is relevant to whether the trial court could reasonably rely on Detective Booher's testimony when it found that the government had carried its burden to justify the stops.[14]

---

[14] Our dissenting colleague cites the trial testimony of Officer Abraham Lazarus to raise a question about Detective Booher's testimony that the two men were ducked down behind shrubs. Appellants did not ask the trial court to reconsider its suppression ruling after Officer Lazarus testified at trial, and we have not definitively resolved whether we can consider undisputed trial testimony only to uphold a pretrial ruling denying a motion to suppress or also to support a conclusion that the court erred in denying suppression. *See Mayo*, 315 A.3d at 623 n.8. We need not resolve that issue here because Officer Lazarus' trial testimony is consistent with Detective Booher's testimony at the pretrial hearing. Officer Lazarus was behind the detective who was behind the dog who found the suspects, so Officer Lazarus' testimony does not establish that no police officer saw the suspects come out from behind the bushes when the dog approached them. Officer Lazarus testified that he "observe[d]" the dog dragging one of the defendants through "overgrown brush" or "brush and . . . briar" in the backyard.

Our dissenting colleague also states that it is "hard to trust" Detective Booher's testimony that Mr. Ricks was stopped ten minutes after the robbery because the trial court found that the robbery was at 3:35 a.m. and Mr. Ricks was spotted "around 4 a.m." Detective Booher testified that Mr. Ricks was stopped

In both the trial court and our court, appellants have not questioned the reliability of Detective Booher's testimony that, for example, the robbery occurred around 3:37 a.m., the police arrived within minutes and established a perimeter, officers stopped Mr. Ricks approximately ten minutes after the robbery, a K-9 dog unit and a police helicopter joined in the search for the two remaining suspects, a police dog found appellants inside the perimeter within two blocks of the robbery, the police conducted a show-up identification, and Ms. Eccles identified appellants about an hour and 45 minutes after the robbery. The reliability of Detective Booher's testimony that appellants were found hiding in the backyard bushes is no more suspect than his testimony about any other aspect of the police investigation. On this record, the trial court could reasonably conclude that Detective Booher's testimony about the stops was reliable.

To paraphrase *Matlock*, 415 U.S. at 175, "there is nothing in the record to raise serious doubts about" Detective Booher's testimony in general or specifically his testimony that the police found appellants hiding behind bushes. At a minimum, the

---

"approximately" ten minutes after the robbery at "approximately" 3:48. Detective Booher's testimony on this point was trustworthy because he spoke directly with Detective O'Donnell and Detective O'Donnell was present for the stop, and Detective Booher's testimony and the trial court's finding, each of which involves approximations of the time, are basically consistent. In any event, the evidence unquestionably establishes that Mr. Ricks was stopped soon after the robbery.

trial court's reliance on his testimony does not rise to the level of plain error. *See Fleming v. United States*, 923 A.2d 830, 835 (D.C. 2007) (the trial court did not commit plain error in denying a suppression motion based on hearsay testimony of a witness who was not evasive, who testified clearly, and who did not embellish or change his testimony).[15]

*K.H.* is consistent with our conclusion. The issue in *K.H.* was whether the police had probable cause to enter an apartment to search for a suspect in an armed robbery recently committed nearby. The only alleged basis for probable cause was a statement by an occupant of the apartment allegedly overheard by officers. To prove this statement at the pretrial hearing, the government called a detective who was not present at the scene. "The detective could say only that it was his 'understanding' the officers entered apartment three because they overheard 'some talk [inside the apartment] about the police being outside' and some 'mention of someone going to run or something like that.'" 14 A.3d at 1091. "[C]ritically," the detective "admittedly could not provide even a reasonably accurate account of what the police professed to have heard." *Id.* at 1092. In addition, the detective "never

---

[15] Our dissenting colleague argues that the trial court's error is plain because Detective Booher's "I don't know" answers to a number of questions "showcased" his lack of reliable firsthand, secondhand, or thirdhand knowledge. The detective's candid admissions that he did not have information about some facts does not suggest that the factual information he did provide was unreliable.

identified the source (or sources) of his 'understanding'; it is impossible to know whether the detective spoke to anyone with personal knowledge of what the police overheard or whether his account involved multiple levels of hearsay." *Id*. at 1091-92. But even if the detective had identified by name the officer on the scene who overheard the statement (or indeed even if the officer who actually heard the alleged statement had testified and provided the same description), the description of the statement was too vague and uncertain to support a finding that the statement created probable cause for a warrantless entry into a person's home.

*K.H.* is distinguishable for two reasons. First, *K.H.* would be analogous if Detective Booher had testified only that he had an understanding from a source he did not identify that the police had set up a perimeter at some unspecified time after an armed robbery, two men were found in a backyard inside the perimeter at some unspecified time, and the two men were found near some shrubbery "or something like that." But Detective Booher's testimony was far more specific than that. As we explained above, he provided numerous details sufficient to establish reasonable suspicion: three men committed an armed robbery around 3:30 a.m.; the police arrived moments after the robbery and promptly set up a perimeter; within roughly ten minutes after the crime, one of the three robbers was quickly apprehended; the police continued searching for the other two suspects; and before 5:15 a.m., the police found two people ducked behind shrubs in a dark backyard inside the

perimeter. Second, unlike the detective who testified in *K.H.*, Detective Booher identified the source of his information: Detective O'Donnell and police reports. Detective Booher's human source was not some random officer with some unspecified involvement in the case, but rather the detective who arrived at the scene shortly after the robbery and who was personally involved in both the apprehension of the first suspect and the identifications of the appellants shortly after they were apprehended. In addition, as we explained above, appellants treated the information in the police reports as reliable.

The result in *K.H.* would have been different if the officer testified at the hearing that he spoke to an officer on the search team who told him that he was standing in the hallway when the officer heard an occupant of the apartment say words to the effect that "the police are outside, they are probably looking for you, and you better run." The trial court in *K.H.* could reasonably rely on such testimony even if the defense complained that they did not have any opportunity at the hearing to test the knowledge or trustworthiness of the testifying officer's source. This scenario is more analogous to the facts in this case. Here, the trial court could reasonably rely on Detective Booher's testimony, based on specified written and oral police sources, that the police found appellants hiding in a backyard inside the police perimeter established shortly after the commission of an armed robbery by three suspects, two of whom were still at large at the time of the stop.

For these reasons, it was not plainly erroneous or unreasonable for the trial court to accept Detective Booher's hearsay testimony as reliable.

## III. Show-Up Identifications

The trial court found that Mr. Parker and Mr. Rollerson did not demonstrate that the show-up identification procedure was unnecessarily suggestive, and that the government established that Ms. Eccles's out-of-court identifications were reliable. These findings were supported by the evidence and in accordance with the law.

Detective Booher's testimony at the suppression hearing established the following facts. Police officers conducted a show-up identification procedure shortly after Mr. Parker and Mr. Rollerson were apprehended about an hour and forty-five minutes after the robbery. The police first did a show-up of Mr. Rollerson, who was handcuffed and escorted by two police officers, and Ms. Eccles identified him as the person who struck her with the shotgun. The police then followed the same procedure with Mr. Parker, and Ms. Eccles positively identified him as a participant in the robbery.

### A. Legal Principles

To prevail on a motion to suppress an identification, a defendant must "demonstrate that the identification procedure was 'so impermissibly suggestive as

to give rise to a very substantial likelihood of irreparable misidentification.'" *Kaliku v. United States*, 994 A.2d 765, 781 (D.C. 2010) (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)). "[I]f the procedure is found impermissibly suggestive, the government may defeat the motion and save the identification by carrying the burden of producing evidence to show that, under all the circumstances, the identification was reliable nonetheless." *Diggs v. United States*, 906 A.2d 290, 300 (D.C. 2006) (quotation and citation omitted). In assessing the reliability of an identification, relevant factors include (1) the witness' opportunity to observe the perpetrator at the time of the crime, (2) the degree of attention the witness paid to the perpetrator, (3) the accuracy of any prior descriptions of the perpetrator provided by the witness, (4) the level of certainty demonstrated by the witness at the time of the identification, and (5) the lapse in time between the crime and the identification procedure. *Id.* (citing *Neil*, 409 U.S. at 198).

Show-up identifications, in which the police show a single suspect in their custody to a witness, are inherently suggestive. *Long v. United States*, 156 A.3d 698, 708 (D.C. 2017). Notwithstanding this inherent subjectivity, we have long recognized "that a prompt show-up identification enhances reliability and serves a purpose to exonerate an innocent person who has been mistakenly apprehended." *Id.* (quotation and citation omitted). Thus, a defendant seeking to establish impermissible suggestivity in this context must show "[s]ome significant coercion

or intolerable suggestivity—*i.e.*, something more egregious than mere custodial status to prove the special elements of unfairness required to establish undue suggestivity in a show-up identification." *Id.* (quotation and citation omitted). "We must examine [a] show-up identification in the totality of the circumstances." *Diggs*, 906 A.2d at 300.

"This court is bound by the trial court's findings on whether identification procedures were impermissibly suggestive and whether an identification was reliable if they are supported by the evidence and in accordance with the law." *Howard v. United States*, 954 A.2d 415, 423 (D.C. 2008) (quotation and citation omitted).

## B.  Discussion

Mr. Parker and Mr. Rollerson argue that the show-up identifications were unduly suggestive because they occurred an hour and forty-five minutes after the robbery. As in *Long*, it was not "impermissibly suggestive for the police to conduct the show-up procedure an hour and forty-five minutes after the robbery." *See* 156 A.3d at 709. The delay was the result of the time it took for the police to discover Mr. Parker and Mr. Rollerson hiding in a backyard. *See United States v. Brown*, 700 A.2d 760, 763 (D.C. 1997) (finding no undue suggestivity when the show-up was delayed until approximately an hour after the incident because the suspects fled the

scene and led police on a chase). As in *Long*, the show-ups were "sufficiently prompt to add to the reliability of the identifications." *See* 156 A.3d at 709; *see also Lyons v. United States*, 833 A.2d 481, 486 (D.C. 2003) ("Any potential for suggestivity was outweighed by the promptness of the show-up, which took place about one hour and fifteen minutes after the robbery.").

Appellants argue the delay conveyed to Ms. Eccles that "she would not be able to leave until she provided the police with the identifications they wanted," and that her "fatigue plus her observations of the police investigative efforts … primed [Ms.] Eccles for a positive identification." However, appellants do not cite evidence Ms. Eccles was anxious to leave or felt pressured to make an identification. Appellants also argue that "[t]he fact that [Ms. Eccles] saw [Mr.] Parker by an ambulance with bloody wounds indicative of a recent altercation further exacerbated the suggestivity of [his] custodial status to an intolerable level." However, these wounds from the police dog were inflicted *after* the robbery and outside Ms. Eccles's presence, and Mr. Parker's condition did not affect any suggestivity of the show-up.

In any event, the trial court reasonably concluded based on the evidence that notwithstanding any undue suggestivity of the show-ups, Ms. Eccles's identifications of Mr. Parker and Mr. Rollerson were reliable. Factors supporting this finding include that Ms. Eccles had the opportunity to view Mr. Parker and Mr.

Rollerson for several minutes in a well-lit area, she gave specific descriptions of her assailants' clothing, hairstyles, complexion, and builds, and she was confident in her identifications. The trial court's findings were "supported by the evidence and in accordance with the law." *See Howard*, 954 A.2d at 423.

## IV. Severance

The trial court did not abuse its discretion when it denied Mr. Parker's and Mr. Rollerson's motions to sever their trials from Mr. Ricks's.

### A. Legal Principles

When the trial judge denies motions for severance, "[w]e review the judge's rulings for abuse of discretion and will reverse only if [an appellant] shows he suffered 'manifest prejudice' as a result of being tried jointly." *Hargraves v. United States*, 62 A.3d 107, 115 (D.C. 2013) (citation omitted).

Superior Court Rule of Criminal Procedure 8(b) provides that an indictment can charge multiple defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions, constituting an offense or offenses." "We employ a strong policy favoring joinder because it expedites the administration of justice in numerous ways." *Bost v. United States*, 178 A.3d 1156, 1180 (D.C. 2018) (quotation and citation omitted). When justified under Rule 8(b),

joinder "serves to expedite the administration of justice, reduce congestion of trial dockets, conserve judicial time, lessen the burdens upon citizens who must sacrifice both time and money to serve as jurors, and avoid the necessity of recalling witnesses who would otherwise be called upon to testify only once." *Jennings v. United States*, 431 A.2d 552, 556 (D.C. 1981).

Rule 14(a) authorizes the Court to sever defendants if the joinder "appears to prejudice a defendant or the government." "[S]ince there is a strong presumption when two or more defendants are charged with jointly committing a criminal offense . . . that they will be tried together, a party seeking severance has the heavy burden of showing the most compelling prejudice." *Bost*, 178 A.3d at 1183-84 (quotation and citation omitted); *Medley v. United States*, 104 A.3d 115, 122 (D.C. 2014). "Some amount of prejudice will be permitted in favor of judicial economy and the concomitant expedition of cases." *Bost*, 178 A.3d at 1184 (quotation and citation omitted). "[I]n order to show that the trial court abused its discretion in denying severance, a defendant must show not merely prejudice, but manifest prejudice." *Elliott v. United States*, 633 A.2d 27, 34 (D.C. 1993) (quotation and citation omitted).

"Severance should be granted only where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the

evidence against his co-defendants, or when failure to do so would violate a defendant's right to due process and a fair trial, such as when co-defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Bost*, 178 A.3d at 1186-87 (quotation and citation omitted).

"It is well-settled that mutually antagonistic defenses are not prejudicial *per se*, and the mere fact that co-defendants' defenses are separate, distinct and antagonistic and that each may have a better chance at acquittal if tried separately is not sufficient for a grant of severance." *Hargraves*, 62 A.3d at 115 (quotation and citation omitted). Manifest "prejudice may not be established per se because two defendants blame one another for the offense charged." *Roy v. United States*, 871 A.2d 498, 503 (D.C. 2005). A difference in defense theories alone does not make the defenses irreconcilable. *See Harrison v. United States*, 76 A.3d 826, 834 n.6 (D.C. 2013) (finding no irreconcilable defenses where one defendant claimed he was not there, and the other claimed self-defense). Likewise, the "fact that counsel for one defendant effectively acts as a 'second prosecutor' is generally insufficient to constitute prejudice requiring severance." *Hawkins v. United States*, 119 A.3d 687, 704 (D.C. 2015) (citation omitted). Instead, an appellant "must demonstrate that there is a danger or risk that the jury will draw an improper conclusion from the

existence of the conflicting defenses alone that both defendants are guilty." *Dancy v. United States*, 745 A.2d 259, 266 (D.C. 2000) (quotation and citation omitted).

### B.    Discussion

Mr. Parker and Mr. Rollerson do not dispute that the charges against them and Mr. Ricks were properly joined in the indictment, and they do not demonstrate that the trial court abused its discretion by concluding that they did not carry their heavy burden of showing manifest prejudice. *See Bost*, 178 A.3d at 1183-84.

The mere fact that defendants had conflicting defenses and blamed each other for the crime does not justify severance. *See Hargraves*, 62 A.3d at 115. The trial court reasonably concluded that any conflict did not create a serious danger that the jury would unjustifiably infer from this conflict alone that all of the defendants were guilty. *See Bost*, 178 A.3d at 1186-87. Mr. Ricks was trying to persuade the jury that he was not guilty, and he argued that even if the jury convicted his co-defendants, it should acquit him. The jury could easily understand that Mr. Ricks's goal was not to persuade the jury to convict his co-defendants; under his argument to the jury, it was in his interests for the jury to acquit his co-defendants because if the jury had a reasonable doubt about their guilt, *a fortiori* the jury had to have a reasonable doubt about his guilt. Moreover, the government's evidence against each appellant was substantial and far from *de minimis*. As the trial court explained, Ms.

Eccles positively identified Mr. Parker and Mr. Rollerson; their DNA and fingerprints were in the car that Ms. Eccles's companion testified the robbers drove to the scene; and they were found together hiding inside the police perimeter.

Appellants argue that Mr. Ricks's counsel elicited testimony and introduced evidence of Mr. Parker's and Mr. Rollerson's guilt. However, this testimony and evidence were cumulative. *See Hargraves*, 62 A.3d at 115 (finding that one defendant's testimony inconsistent with co-defendants' defenses did not require severance because the testimony was cumulative). Appellants claim that Mr. Ricks's lawyer "explicitly pointed the finger" at Mr. Parker and Mr. Rollerson, telling the jury in his opening and closing argument that "they, not Mr. Ricks, were guilty." However, "the level of the antagonism in defenses is measured by the evidence actually introduced at trial" and not by closing arguments. *Dancy*, 745 A.2d at 266 (quotation and citation omitted).

## V.    Management of Testimony

The trial court's management of Ms. Eccles's immunity issue and cross-examination was not an abuse of its discretion.

## A. Background

On Thursday, April 28, the prosecution conducted Ms. Eccles's direct examination. The defense had made clear that it would cross-examine Ms. Eccles about her own criminal activity, and the trial court appointed counsel to advise her with respect to Fifth Amendment issues and potential immunity. The government offered letter immunity, but because her cross-examination might involve violations of federal criminal law in jurisdictions other than the District of Columbia, Ms. Eccles insisted on statutory immunity from a U.S. district court. In the afternoon after Ms. Eccles's direct testimony, the trial court and the parties discussed options, and the trial court expected that the defense could cross-examine her on Monday, which was the next trial day, after she obtained federal immunity. The court told the jurors that they would not come in on Friday and that Ms. Eccles would return for cross-examination on Monday, May 2.

On Monday morning, May 2, the prosecution informed the trial court that the federal court had not yet granted the application for immunity for Ms. Eccles, and in the meantime, the government called two witnesses, the second of whom was Detective O'Donnell. During a break in Detective O'Donnell's testimony, the government tendered a signed immunity order for Ms. Eccles. With no objection from the defense, Detective O'Donnell's direct examination resumed after the break.

On Tuesday May 3, Mr. Parker and Mr. Rollerson asked to cross-examine Ms. Eccles before they cross-examined Detective O'Donnell. The trial court denied the request, concerned that it would create more problems for the jury than it would solve. The defense cross-examined Detective O'Donnell for the remainder of that day. When it excused the jury at the end of the day, the trial court explained to the jurors that trial would resume on Tuesday, May 10 because of scheduling issues.

On Tuesday, May 10, trial resumed, and the defense thoroughly cross-examined Ms. Eccles.

## B.     Discussion

Mr. Parker and Mr. Rollerson do not show that the trial court abused its discretion in managing Ms. Eccles's direct and cross-examination.

"[T]he trial judge 'may determine generally the order in which parties will adduce proof [and that] determination will be reviewed only for abuse of discretion.'" *Hargraves*, 62 A.3d 118 (quoting *Geders v. United States*, 425 U.S. 80, 86 (1976)). In order to show an abuse of discretion, an appellant must demonstrate that he has been prejudiced. *Johnson v. District of Columbia*, 655 A.2d 316, 318 (D.C. 1995).

Appellants complain that the trial court should have gotten, before Ms. Eccles testified, a proffer about whether her privilege might impede its intended cross-examination. However, the trial court had enough information to know that immunity would facilitate the cross-examination, and it reasonably expected the immunity issue to be resolved promptly so that the defense could start its cross-examination on the next trial day. Ms. Eccles had immunity when the defense cross-examined her, so her privilege did not impede the actual cross-examination, and appellants conducted a robust cross-examination, including exploring possible bias relating to her immunity. Appellants argue that they should have had more information about the status of Ms. Eccles's immunity before her testimony began, but here again, they do not show any prejudice to their cross-examination: any Fifth Amendment privilege during her direct testimony only limited the testimony that the government could elicit; and the defense had free rein in its cross-examination.

Appellants claim that the lengthy and unexpected delay between Ms. Eccles's direct and cross-examination prejudiced them because the jury had only her narrative for two weeks, during which it heard from witnesses who bolstered that narrative. However, contrary to their assertion the sequence of events deprived them of "a key opportunity to highlight witness credibility issues to the jury," appellants were able to mount a vigorous attack on Ms. Eccles's credibility. The trial court did not abuse its discretion in concluding that it made more sense to complete the cross-

examination of Detective O'Donnell on May 3 than to start Ms. Eccles's cross-examination. Although 12 calendar days intervened between the direct and cross, only two trial days intervened, so the amount of intervening testimony was limited. In these circumstances, the trial court reasonably concluded that the delay in Ms. Eccles's cross-examination would not materially impair its effectiveness with the jury.

For these reasons, Mr. Parker and Mr. Rollerson have not established that the trial court abused its discretion in managing Ms. Eccles's testimony.

## VI.     Response to the Jury Note

Mr. Rollerson contends that he was prejudiced by the trial court's response to a jury note. When the jury sent a note concerning the AWIK charge against Mr. Ricks, the trial court did not abuse its discretion by denying Mr. Rollerson's request to give an instruction relating to the robbery charge and by giving instead a response that directly answered the jury's question. It follows that the trial court did not abuse its discretion by denying his motion for a mistrial.

### A.     The Jury's Note

At the close of the trial, the trial court instructed the jury on the armed robbery charge, including explaining the aiding and abetting theory applicable to Mr. Parker

and Mr. Rollerson.  The trial court also instructed the jury on the AWIK charge against Mr. Ricks only.  The trial court specified that each count of the indictment charged a separate offense, and the jury should consider each offense, and the evidence which applies to it, separately.

On the first day of deliberations, the jury sent a note indicating that it could not reach a verdict on some of the charges.  The trial court responded that the jury had only been deliberating for a few hours and asked them to continue deliberations.

On the second day of deliberations, the jury sent a note asking (1) whether it could convict Mr. Ricks of AWIK on an aiding and abetting theory, if it was convinced that there was a gunman, but not sure whether the gunman was Mr. Ricks and Mr. Rollerson, and (2) whether they could convict Mr. Ricks of AWIK only if they believed he was the gunman.  The trial court discussed the notes with the parties. Mr. Rollerson asked the court to re-instruct the jury that it could convict him of armed robbery only if it unanimously found that "Mr. Rollerson and/or Mr. Parker knew Mr. Ricks possessed the gun and that they aided and abetted Mr. Ricks in the robbery."  The court rejected Mr. Rollerson's proposed instruction.  Instead, the trial court gave the jury the following instruction:

> The answer to [the first] question is no.  You may not find Mr. Ricks guilty of [AWIK] based on an aiding and abetting theory….  The answer to question two is the following: [t]o find the defendant, [Mr.] Ricks guilty of

assault with intent to kill you must find that each element of that offense is satisfied with respect to him beyond a reasonable doubt. And I will refer you back to the assault with intent to kill instruction, which is 4.111.

Mr. Rollerson moved for a mistrial on the ground that the two notes indicated that the jury was basing its deliberations on facts not in evidence. The court denied the motion, reasoning that the first note "just indicated that they were at an impasse," and the second note showed that "[t]hey're actually evaluating the evidence and trying to figure out how to apply the instructions that they were given."

## B.     Legal Principles

"The decision on what further instructions, if any, to give in response to a jury question lies within the sound discretion of the trial court." *Yelverton v. United States*, 904 A.2d 383, 387 (D.C. 2006) (quotation and citation omitted). Absent an abuse of discretion, we will not reverse the trial court's decision on appeal. *Alcindore v. United States*, 818 A.2d 152, 155 (D.C. 2003). "When the jury explains specific difficulties, the trial court should clear them away with concrete accuracy." *Id.* (quotation and citation omitted). "When a jury sends a note which demonstrates that it is confused, the trial court must not allow that confusion to persist; it must respond appropriately." *Id.* "And we have recognized that telling jurors to refer back to their original charge may be appropriate in some circumstances where the initial instructions accurately and thoroughly provided elements and definitions of

the crimes charged." *Parker v. United States*, 249 A.3d 388, 399 (D.C. 2021) (quotation and citation omitted).

## C.    Discussion

The trial court did not abuse its discretion in responding to the jury's note or in denying Mr. Rollerson's motion for a mistrial.

Based on the jury's note about the AWIK charge against Mr. Ricks, Mr. Rollerson infers that the jury was operating "on the speculative theory that he was the gunman," and he argues that the trial court did "nothing to clear up the [jury's] underlying confusion." However, the trial court reasonably interpreted the jury's note to indicate only that the evidence about Ms. Eccles's descriptions of the robbers might leave it with a reasonable doubt that Mr. Ricks was the gunman—not that it proved beyond a reasonable doubt that Mr. Rollerson was the gunman. Such a reasonable doubt about Mr. Ricks could have arisen because Mr. Rollerson's hairstyle was consistent with Ms. Eccles's description of the gunman, and Mr. Rick's hairstyle was consistent with Ms. Eccles's description of a different suspect. The jury was simply asking whether it could convict Mr. Ricks of AWIK on an aiding and abetting theory if it had a reasonable doubt that he was the gunman. Mr. Rollerson did not offer any reason to believe that the jury was thinking of convicting

him of AWIK—a crime with which he was not charged at all, either as a principal or an aider and abettor.

Accordingly, the trial court reasonably concluded that the jury was "actually evaluating the evidence and trying to figure out how to apply the instructions that they were given." The trial court's response directly and clearly answered the question that the jury actually asked: the jury could not convict Mr. Ricks of AWIK on an aiding and abetting theory if it was not sure that he was the gunman. Equally forthright was the trial court's response to the second question, which reasonably referred the jury back to the AWIK instruction, which stated that it could convict Mr. Ricks of AWIK only if it found that he was armed with a firearm. *See Parker*, 249 A.3d at 399. These answers did not prejudice Mr. Rollerson.

In this context, the trial court reasonably concluded that it need not give Mr. Rollerson's proposed instruction about the robbery charge—that the jury could find him (and/or Mr. Parker) guilty of armed robbery only if he knew that Mr. Ricks had a gun and aided and abetted Mr. Ricks. The trial court reasonably understood, consistent with its plain language, that the jury's note related only to the AWIK charge against Mr. Ricks, and that it did not need to repeat or elaborate on its previous, and clear, instructions on armed robbery, including the aiding and abetting theory. Mr. Rollerson does not dispute that the jury was properly instructed on

aiding and abetting armed robbery, or that the evidence was sufficient to support the conviction on that basis.

Finally, Mr. Rollerson argues that the trial court erred in denying his motion for a mistrial. "A mistrial is a severe remedy – a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *Salmon v. United States*, 719 A.2d 949, 956 (D.C. 1997). Therefore, "we will reverse the denial of a motion for a mistrial only if the decision appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice." *Id.* (quotation and citation omitted). The trial court was neither irrational, nor unreasonable, nor extreme when it concluded that the jury's note did not mean that it was thinking about convicting Mr. Rollerson as the gunman.

## VII. Conclusion

For these reasons, we affirm the judgment of the Superior Court.

*So ordered.*

BECKWITH, *Associate Judge*, dissenting: The government's only evidence in support of reasonable articulable suspicion for the seizure of Deangelo Parker and Delonta Rollerson was the testimony of a detective, Darin Booher, who played no role at the crime scene—instead recounting hearsay of another detective, Thomas

O'Donnell, who himself was not present for the seizure, when a police dog bit and dragged Mr. Parker by his head and officers apprehended the two men. What Detective O'Donnell told Detective Booher about that seizure appeared to rely on somebody else's account. Yet by the end of the hearing, the record was devoid of evidence as to (1) how many layers of hearsay Detective Booher's testimony entailed; (2) whether Detective O'Donnell's source or sources had personal knowledge about the details of the seizure; (3) the identities of any source who *did* have personal knowledge about the seizure; or (4) whether Detective Booher's account encompassed all the details about the seizure—and about Mr. Parker and Mr. Rollerson's behavior and comments upon being seized—that the original sources might have testified to had they been called. It was also devoid of any finding by the trial court that Detective Booher's testimony about the seizure originated from someone who witnessed it.

To be sure, our cases do not preclude the government from offering such an unusually truncated and potentially incomplete version of the facts of a seizure based on double (or triple or quadruple) hearsay without evidence of the identity of anyone with personal knowledge. Hearsay is generally allowed at pretrial hearings on the admissibility of evidence, including suppression hearings. *See United States v. Matlock*, 415 U.S. 164, 172-76 (1974); *Fleming v. United States*, 923 A.2d 830, 835 (D.C. 2007).

But the fact that evidence is admissible at a suppression hearing does not mean it is sufficient to justify a search or seizure in the absence of an identified source with personal knowledge. In that regard, there is a case on point to guide our analysis. In *In re K.H.*, 14 A.3d 1087, 1091 (D.C. 2011), the government attempted to establish the legality of police officers' warrantless entry into an apartment to arrest a robbery suspect through testimony of an officer who "had no personal knowledge of the circumstances giving rise to the entry." *Id.* at 1089. Basing his testimony "on information he had acquired from other police officers whom he did not identify," the officer testified that police knew from the victim that the suspect had fled to one of four apartments and that his "understanding" was that police had overheard voices coming from the apartment they chose to enter. *Id.* "As far as the detective knew, '[t]here was some talk about the police being outside' and '[t]here was mention of someone going to run or something like that,' '[s]omething about running,'" and that police "were allowed in" and "didn't force their way in." *Id.*

In unanimously reversing denial of the suppression motion, the division in *K.H.* focused in part on the testifying officer's inability to establish the personal knowledge and trustworthiness of the original source. "Instead of offering the testimony of one of the officers who entered apartment three in pursuit of the fleeing robber," the court said, the government "relied exclusively on the hearsay testimony of Detective Thompson, a witness who possessed no personal knowledge of the

entry." *Id.* at 1091. The court noted that "*[t]rustworthy* hearsay is admissible in a suppression hearing and may justify a finding of probable cause," but concluded that "Detective Thompson's testimony was, on the essential point, too unreliable and uncertain to support such a finding." *Id.* Detective Thompson "could say only that it was his 'understanding' the officers entered apartment three because they overheard 'some talk about police being outside' and some 'mention of someone going to run or something like that.'" *Id.* In the court's view, Detective Thompson's testimony contained "glaring" "deficiencies," including that he "never identified the source (or sources) of his 'understanding'" and that "it [was] impossible to know whether the detective spoke to anyone with personal knowledge of what the police overheard or whether his account involved multiple levels of hearsay." *Id.* at 1091-92. "Without such knowledge," the court said, "one cannot reasonably conclude that the detective's 'understanding' of what the police heard was reliable." *Id.* at 1092.

The facts here are even plainer than in *K.H.* in the sense that, instead of it being "impossible to know," we know for certain that the testifying officer's source did not have personal knowledge about the seizure. Detective O'Donnell was not present when police seized Mr. Parker and Mr. Rollerson. Detective Booher also did not speak to any other officers who were at the scene, had not reviewed the police radio broadcasts from that night, and did not know what the responding officers had broadcast over the radio. When defense counsel asked him questions about the

circumstances leading up to and surrounding the seizures of Mr. Parker and Mr. Rollerson, he was unable to answer a large number of them. *See e.g.*, Suppression Hr'g Tr. 275, Apr. 20, 2016 ("I'm not sure."); *id.* at 291 ("I don't know that."); *id.* at 292 (prosecutor stating, "He doesn't know"); *id.* at 293 ("Again, I don't know."); *id.* at 295 ("I don't know" and "I don't know that either."); *id.* at 296 ("I don't know" and "I don't know that for sure."); *id.* at 305 ("I don't know."); *id.* at 306 ("[A]gain, I don't know[.]"); *id.* at 308 ("I don't know."); *id.* at 310 ("I don't know[.]"); *id.* at 314 ("I don't know."); *id.* at 323 ("I don't know . . . I do not know . . . I don't know that either.").

If, in fact, a dog tracked to the suspects' position where they were attempting to hide in someone else's backyard around 5 a.m. within a perimeter that had been set up within ten minutes and maintained for more than ninety minutes after a robbery, police here may have had reasonable articulable suspicion for a *Terry* stop. But the bulk of the assumptions comprising this narrative have no reliable basis. Instead, nearly all of the assumptions my colleagues in the majority invoke to justify the seizure and to distinguish *K.H.* are the same assumptions that we cannot say are more likely than not to be true, given the multiple layers of hearsay, the lack of personal knowledge of at least two of the declarants in the hearsay chain, the failure to identify a reliable source with personal knowledge, and the possibility that the account given by Detective Booher, even *if* accurate as far as it goes, leaves out

critical details about the seizure that are relevant to its validity. In light of these circumstances—and the holding of *K.H.*—I respectfully dissent from the court's affirmance of the denial of the defendants' suppression motions.

***The Majority's Seizure Analysis***

To its credit, the majority acknowledges that the evidence did not support several factors the trial court relied on in finding reasonable articulable suspicion. These include the court's findings that officers who seized Mr. Parker and Mr. Rollerson had a basic description of the two suspects, that the perimeter the police purportedly set up was secure, and that the suspects' attempt to flee from a dog evinced consciousness of guilt. *Ante* at 15, 18-20. My colleagues nonetheless go on to conclude that police had reasonable suspicion to believe that Mr. Parker and Mr. Rollerson were the people they were looking for based on four main factors: (1) police discovered them in the backyard of a house at a time—a little after 5 a.m.— that is "hardly an hour when people are ubiquitous in our city's backyards," (2) the suspects were not behaving innocently but were "hiding by shrubbery," indicating consciousness of guilt; (3) the men were found in a "police perimeter"; and (4) the perimeter was established minutes after the robbery occurred, so when the men were found an hour and forty-five minutes after the robbery, it was reasonable to infer that they had been hiding in a backyard inside that perimeter all along, arousing more

suspicion. *Ante* at 13-20. With respect to each of these factors, the majority's reasoning rests on factual assumptions that take as a given the reliability and completeness of the multiple hearsay account eventually recited—at least partially— by Detective Booher. The main problem with this is that the facts relied on were not proven by a preponderance through evidence shown to be reliable, complete, and based on personal knowledge.

This claim, the majority holds, is subject to review only for plain error because "appellants did not make this reliability argument in the trial court." *Ante* at 21. According to my colleagues, Mr. Parker and Mr. Rollerson failed to preserve this argument for appellate review because they neglected to explicitly indicate that Detective Booher "did not specify the source of his information or demonstrate his information was ultimately based on first-hand knowledge." *Ante* at 22. The government's brief does not argue that plain error review applies to the trial court's suppression ruling.[1]

---

[1] The majority's contention that the government had no reason to raise plain error because appellants' own briefs did not challenge the reliability of Detective Booher's hearsay testimony seriously misapprehends the arguments presented in Mr. Parker's brief and adopted by Mr. Rollerson. As a threshold matter, in evaluating a trial court's denial of a suppression motion, this court considers the "totality of 'the facts available to the officer at the moment of the seizure'" "to determine whether the government proved that a defendant's constitutional rights were not violated." *Mayo v. United States*, 315 A.3d 606, 617, 620 (D.C. 2024) (en

At the outset, regardless of appellants' level of precision in objecting to Detective Booher's failure to identify the source of his information about the seizure and to show its firsthand origin, parties "can make any argument in support of [a] claim"—here, the claim that the government failed to prove that police had reasonable suspicion to seize them—and "parties are not limited to the precise arguments they made below." *See Yee v. City of Escondido*, 503 U.S. 519, 534

banc) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).  Put differently, "our role as an appellate court is to ensure that the trial court had a substantial basis for concluding" that no constitutional violation occurred."  *Joseph v. United States*, 926 A.2d 1156, 1160 (D.C. 2007).  Even a somewhat generic challenge to a trial court's finding of reasonable suspicion therefore triggers our assessment of the quality and nature of the evidence before the trial court.  But Mr. Parker's briefing goes beyond the conventional argument that the facts as found by the trial court did not provide reasonable suspicion.  He does make that argument, but he also highlights Detective Booher's lack of personal knowledge, details the weaknesses in his "unsubstantiated" testimony, and challenges the government's reliance upon trial testimony to fill those gaps.  *See* Parker Br. 43-44; *id.* at 8 (stating that "the government's only witness, Detective Darin Booher, had no firsthand information about what occurred"); *id.* at 12 (referring to appellants' "objections that the government could not meet its burden solely through Booher's insufficiently-detailed hearsay testimony"); *id.* at 44 (noting that "no evidence was introduced at trial that police saw Parker or Rollerson at all, much less behind shrubs," before the seizure); *id.* (arguing that the trial court "relied on facts unsupported by the evidence"); *id.* at 43 (identifying facts that Detective Booher was "uncertain about" or "did not know"); Reply Br. 13-15; *id.* at 13 (noting that Detective Booher did not testify that K-9 warnings were given "because he did not know"); *id.* at 15 (noting that Detective Booher was unsure when or whether a lookout was broadcast); *id.* (noting that Booher's testimony "did not establish that the police knew Parker was hiding in bushes").  Mr. Parker's appellate arguments are one and the same as an attack upon the reliability of the government's sole witness and plainly trigger our review of the reliability of the testimony upon which the trial court's reasonable suspicion finding relied.

(1992); *Jones v. United States*, 990 A.2d 970, 981 n.34 (D.C. 2010) (distinguishing between "new legal arguments on appeal to support a claim made below" and "an entirely new factual claim"); *see also Benn v. United States*, 801 A.2d 132, 140 n.7 (D.C. 2002).

Even if such specificity were required, appellants' wide-ranging objections—which the trial court never addressed or even acknowledged—unmistakably conveyed the argument that for reasons akin to those in play in *K.H.*, Detective Booher's testimony was not sufficiently reliable to support reasonable suspicion. Counsel for Maurice Ricks, for example (the third codefendant who is not a participant in this appeal), acknowledged the potential relevance of hearsay at a suppression hearing, but said "the government needs to take this a little more seriously than putting up a witness who has read a report or had a conversation," particularly "given the severity of these charges." Mr. Ricks's counsel emphasized the peculiarity of a suppression hearing in which the government's only witness "truly . . . knows nothing about the case" and "had no role at all in any individual part of the stop, the detention or identification procedure." He likened the proceeding to "litigating Fourth Amendment issues based on a police report," except that here, a police report would have been more informative and "more detailed than what detective Booher knew." "Essentially the government has given the Court a record that is completely lacking in all detail that we would need to reasonably

address these issues."

Along these same lines, Mr. Rollerson's counsel pointed out that, after hearing Detective Booher's testimony, "We don't know how big the perimeter was. . . . We don't know where [Mr. Rollerson] . . . came from. We don't know what street he was stopped at, what side of the property he came out of." He attributed these lingering questions to Detective Booher's lack of personal knowledge of the underlying seizure and asked the court to "overlook" the detective's testimony, noting that "the government got to elect what witnesses that they chose to put on" and decided to call a witness who could not answer basic questions about the seizure.

Mr. Parker's counsel likewise acknowledged that "hearsay is certainly allowed," but said that "in this particular case . . . we wanted to explore what was going on that night . . . we couldn't get any information." He found it

> quite interesting that we have this particular police officer who has no knowledge whatsoever of the events that evening as the person who testified. The point of cross-examination is to get to the truth. It's incredibly difficult to get to the truth to actually probe these issues as to see, really, what was going on, what really happened that day when you have somebody who has only heard bits and pieces.

Counsel argued that, because Detective Booher could not say "what really happened

that day," his testimony could not establish that the officers had reasonable suspicion to stop the men.

Contrary to the majority's view, Mr. Parker and Mr. Rollerson preserved this challenge to the reliability of the detective's hearsay testimony. In asking the court to "overlook" Detective Booher's testimony, counsel was suggesting that the judge give it no weight—perhaps even strike it.[2] The codefendants did not cite *K.H.*, but they echoed its central point that hearsay testimony that contains stark deficiencies and lacks indications that it comes from a source with personal knowledge can be insufficiently reliable to support a finding of probable cause or reasonable suspicion. Their complaints—that Detective Booher's surprising lack of knowledge about the case prevented them from getting at what really happened and that permitting hearsay had to mean more than "putting up a witness who has read a report or had a conversation"—were objections to the overall reliability of the detective's information bearing on the Fourth Amendment challenge to the men's seizure.[3] My

---

[2] In ruling on the motion to suppress, the trial court stated that "the things I'm saying"—referring to its findings—"obviously, are being credited." Suppression Hr'g Tr. 4, Apr. 21, 2016. The court did not get into detail about what weight it was affording Detective Booher's testimony and why.

[3] It is worth noting that in *K.H.* itself, the government argued on appeal that K.H. did not object to hearsay at the suppression hearing. K.H. also apparently did not ask the police witness at the suppression hearing the identity of his source and whether that person had personal knowledge. He instead posed objections similar

colleagues say the codefendants' problem with Detective Booher's testimony "was not with what [he] knew but with what he did *not* know." *Ante* at 21. The point, though, is that the detective's testimony about what he "knew," such as that the appellants were hiding before they were seized, was unreliable because of what he did not know—that is, because it was not based on personal knowledge.[4]

Relatedly, my colleagues in the majority are disinclined to question the reliability of Detective Booher's testimony in part because it was "not rebutted or even impeached." *Ante* at 25. Besides discounting the fact that the government bears the burden of proof, this also disregards the defendants' persistent complaints to the trial court about their inability to test the accuracy of Detective Booher's claims because of the multiple layers of hearsay. As defense counsel made clear in their objections at the suppression hearing, they had no way to impeach Detective Booher and "get to the truth" of "what really happened that day" when Detective

---

to the codefendants' objections here, stating, for example, that "[t]he testimony of Detective Thompson was a lot of [']my understanding is this,['], [']my understanding is that.['] He didn't really know, he wasn't there when this search of the building occurred. And he's not really sure what was said."

[4] Even if plain error applies, this is plain error. Detective Booher showcased his lack of reliable firsthand (or secondhand or thirdhand) knowledge by, among other things, answering "I don't know" to dozens of questions, providing clear grounds for the trial court to determine that the government failed to present sufficiently reliable evidence of reasonable suspicion. *See supra* p. 51.

Booher was not present at the event he was describing and had "only heard bits and pieces" from another person who also lacked personal knowledge of the seizure. "Cross-examination 'is the principal means by which the believability of a witness and the truth of his testimony are tested,'" *Coles v. United States*, 36 A.3d 352, 356 (D.C. 2012), but Detective Booher's unfortunate distance from the event about which he was testifying made it all but impossible to nail down and scrutinize his account. *Crawford v. Washington*, 541 U.S. 36, 61-62 (2004) (stating that "testing in the crucible of cross-examination" is "how reliability can best be determined"); *cf. Florida v. J.L.*, 529 U.S. 266, 270-71 (2000) (holding that anonymous tip lacked "sufficient indicia of reliability" because police could not test "informant's knowledge or credibility" (quoting *Alabama v. White*, 496 U.S. 325, 327 (1990))). The more relevant declarant or declarants were, as in *K.H.*, unknown.

In short, the majority's analysis rests on both a mistaken belief in the reliability of Detective Booher's factual assumptions about the circumstances surrounding the seizure and a mistaken view that the lack of specific impeachment and rebuttal of Detective Booher's claims somehow bolsters their reliability. As to the factors the majority most relies on, this is borne out in different ways.

### *The Early Hour When the Dog "Tracked" to a Residential Backyard*

As an initial matter, I am skeptical of my colleagues' view that shortly after

five in the morning, when some early birds might well be taking out the trash, heading out for a run, or walking their dog, "one would not expect to see people engaged in innocent activity in a backyard." *Ante* at 13-14. It is "common sense," according to my colleagues, "to suspect that two people at this hour in this location in these circumstances are not there for an innocent reason." *Id.* at 14. The majority points to *Funderburk v. United States*, 260 A.3d 652, 659 (D.C. 2021), *see ante* at 13, but Mr. Funderburk's presence in a deserted alley at 2:20 a.m. on a December weeknight thirty seconds after officers heard gunshots coming from the very same alley is markedly more conspicuous than the presence of two people in a residential backyard not long before daybreak nearly two hours after a robbery happened two blocks away. *Funderburk*, 260 A.3d at 659. The majority also cites *Umanzor v. United States*, 803 A.2d 983, 989, 994 (D.C. 2002), *see ante* at 14, but the stop in that case, as in *Funderburk*, took place much earlier in the morning and the police had a lookout description that at least matched the "make, model and, at first glance, color" of the car they stopped. Here, there was no evidence that the police who stopped Mr. Parker and Mr. Rollerson had any description of them at all.

With respect to location, Detective Booher did not know the address at which Mr. Parker and Mr. Rollerson were apprehended, except that it was in a backyard. He testified at various points that he "guess[ed]" that it was a block from the alleged robbery, that he couldn't remember if he was informed that it was "two blocks or

just a block," that he "believe[d] it was within a two block radius," and that he "kn[e]w it was within that two block radius." And while he said that no one told him that anybody else was "hiding around that area" or "stopped in that area," he did not say that anyone specifically told him there were not other people around.

Similarly, though the majority uses the word "tracked" in its description of Detective Booher's testimony about the role of the K-9 dog in the search for Mr. Parker and Mr. Rollerson, *see ante* at 8, it acknowledges that there is no evidence that the dog "tracked" to Mr. Parker's location based on a crime-relevant scent. On the contrary, Detective Booher's use of the term "tracked" conveys only that the police and the dog ended up at the same place as the suspects, and the dog's presence at the scene of the seizure is not a fact tending to justify the seizure.

### *The Suspects' "Hiding by Shrubbery" in Someone Else's Backyard*

According to my colleagues in the majority, it was particularly suspicious that Mr. Parker and Mr. Rollerson were hiding when police first spotted them—that is, that "[t]hey were ducked down behind home [sic] shrubs in the back yard of a residence that was contained within [the] rectangle" encompassed by James Place, Hunt Avenue, 55th Street, and Eastern Avenue. The majority also infers, from the lack of evidence that the suspects were engaged in innocent behavior, that the police could have reasonably concluded at the time that Mr. Parker and Mr. Rollerson

"were the two suspects they were looking for." *Ante* at 20. Both of these assumptions are purely speculative and not established by the government's evidence at the hearing.

First, the record does not contain a reliable basis for the trial court's finding that the suspects were hiding in the bushes. The trial court heard no evidence from any source with personal knowledge about whether the suspects were "hiding" when found by police. In fact, while not necessary to the analysis of the sufficiency of the suppression hearing record, it is worth noting that the only witness with actual personal knowledge of the seizure, Officer Abraham Lazarus, testified later at trial that he did not see what the men were doing before they were seized and that he first saw the men when Mr. Parker was being dragged by the already-released dog. *See* Trial Tr. 266-67, May 11, 2016 ("I only saw when the dog was pulling the one suspect out in between the fences"); *id.* at 272 (answering "I don't know" to the question, "What position was the defendant in when the dog made contact with him?"); *id.* at 286-87 (agreeing that he did not see Mr. Parker flee and that when he first saw Mr. Parker he "was clearly injured by the dog"). Detective Booher's suppression hearing testimony could not reliably establish that the men were hiding because his source, Detective O'Donnell, was not present at all, Detective O'Donnell's own source was unidentified, and even the officer with firsthand knowledge who testified at trial did not and could not fairly describe what Mr. Parker

and Mr. Rollerson were doing before the dog bit Mr. Parker because he did not see them. Detective Booher also could not clarify key details of the officers' actions in the events leading up to the seizure. He was unable to say, for example, that the police warned the men before releasing the dog to apprehend them.

Given the lack of sound information about whether and how the men were hiding, this consideration contributes nothing to a finding of reasonable suspicion. More specifically, it does not constitute trustworthy hearsay under *K.H.*, where we held that the testimony of the government's hearsay witness (a detective who arrived on the scene after the events relevant to the hearing and did not identify the source of his testimony) at a suppression hearing was "unreliable and uncertain" and could not support the trial court's finding that police had probable cause to enter an apartment in search of a suspect. 14 A.3d at 1088, 1091.

The majority's attempt to distinguish *K.H.* falls short. *See ante* at 29-30. Among other things, my colleagues state that unlike in *K.H.*, where "the testifying witness could not provide even a reasonably accurate account" of what words officers heard coming from inside the apartment before they entered, "Detective Booher's testimony was far more specific" and "provided numerous details." *See ante* at 29. On the contrary, Detective Booher's testimony was largely devoid of details about the facts most central to reasonable suspicion. Further, where in *K.H.*,

it was "impossible to know" whether the officer's account "involved multiple levels of hearsay," here we know for sure that whatever details about the seizure Detective Booher gleaned from Detective O'Donnell were in fact the product of multiple levels of hearsay. *See K.H.*, 14 A.3d at 1091-92. This explains why even in relaying "details" to Detective Booher, Detective O'Donnell was so tentative, further detracting from his own reliability and the reliability of whoever his source was.[5]

This court reversed the denial of the suppression motion in *K.H.* because there was no way to evaluate the reliability of the police witness's testimony about critical facts relevant to the existence of probable cause. *K.H.*, 14 A.3d at 1091-92. The same is true here.

Perhaps recognizing the dearth of reliable evidence that the suspects were hiding, the majority nonetheless states that the trial court "could reasonably conclude that Detective Booher's testimony about the stops was reliable" because his "human source was not some random officer with some unspecified involvement in the case, but rather the detective who . . . was personally involved," *ante* at 27, 30. But there is no cause for reassurance that Detective Booher's information came from someone

---

[5] Detective Booher testified, for example, that he remembered "detective O'Donnell specifying that [Mr. Rollerson] tried to jump over a fence and *either* got tripped up *or* was apprehended immediately on the other side of the fence." Suppression Hr'g Tr. 327, Apr. 20, 2016 (emphasis added).

with personal knowledge about the seizure. The opposite is true. Detective Booher specifically named *Detective O'Donnell* as the source of various details about the seizure. He said, for example, that he "remember[ed] Detective O'Donnell specifying" that Mr. Rollerson "tried to jump over a fence." Suppression Hr'g Tr. 327, Apr. 20, 2016. And after having his memory refreshed by "detective O'Donnell's initial case resume," Detective Booher testified that the dog bit Mr. Parker in the head and that Mr. Rollerson tried to flee.[6] *Id.* at 277-79.

But again, Detective O'Donnell was not present when police seized Mr. Parker and Mr. Rollerson, and it seems possible—particularly given that no trial witness testified to seeing the men hiding—that Detective O'Donnell merely made an assumption that the men had been hiding. Detective Booher did not identify the

---

[6] The majority notes that one of the police reports in this case indicated that police found Mr. Parker and Mr. Rollerson "hiding in the rear of" a particular house. *Ante* at 24. That report—which was not in evidence—was authored by Officer Christopher Woody, someone Detective Booher never mentioned in his testimony. Just like Detective O'Donnell, Officer Woody himself appears not to have had firsthand knowledge of any suspects "hiding." At trial, Officer Sarah Hillman testified that she was with Officer Woody in front of some houses on Hunt Place that night when she heard loud noises coming from behind the houses, received a radio alert that the K-9 officers "had one in custody" and another one running toward Hunt Place, and shortly thereafter joined Officer Woody in apprehending Mr. Rollerson as he was running between houses toward their location in front. Trial Tr. 226, 231-32, May 11, 2016.

officers who conducted the seizure as the source of any of his knowledge about that incident, and he did not say how Detective O'Donnell learned the information he gave him. Several times when defense counsel sought more specific information from him on cross-examination, Detective Booher responded that Detective O'Donnell had not provided those details. *See* Suppression Hr'g Tr. 281, Apr. 20, 2016 ("That was not specified by detective O'Donnell."); *id.* at 290 ("I did not get that specific with him[.]"); *id.* at 293 ("That wasn't specified to me."); *id.* ("He didn't specify that."); *id.* at 320 (I don't recall that being specified[.]"); *id.* at 322 ("That was not specified."). Contrary to my colleagues' contention, there is no evidence from which to infer that Detective Booher's testimony that the men were "ducked down" or "hiding" stemmed from a reliable source with firsthand knowledge of what actually happened. The same was true in *K.H.*, where we noted the "glaring" "deficiencies" in the detective's hearsay-based testimony, based on an unknown source or sources, that it was his "understanding" that the officers entered the apartment because of "some talk" coming from inside that they overheard. 14 A.3d at 1091-92. If the government had called *Detective O'Donnell* to testify at the suppression hearing, it would be the very same state of play as in *K.H.* Detective Booher just adds another layer of hearsay.

Second, the majority infers from Detective Booher's testimony that the

suspects were not engaged in some other innocent activity.[7] *Ante* at 14-15, 20. But this factual assumption is based solely on the fact that Detective Booher's patchy testimony offered no evidence from people with personal knowledge about what Mr. Parker and Mr. Rollerson were doing. If such witnesses had testified, the parties could have asked them questions to probe the suspects' behavior upon being encountered by the dog and the police. These key unanswered questions in the hearing are precisely what is wrong with relying on multiple hearsay. The issue is not merely the accuracy of the particular claims of other people being repeated by the testifying officer. It is also the completeness of the account being repeated. *See, e.g.*, *Perry v. Leeke*, 488 U.S. 272, 283 n.7 (1989) (noting that cross-examination "can expose inconsistencies, *incompletenesses*, and inaccuracies in [] testimony") (quoting 4 J. Weinstein, Evidence ¶ 800[01] (1988)).

### *The Suspects' Presence for More Than an Hour in a "Perimeter"*

Finally, the majority argues that although the hour-and-a-half to two-hour time period between the robbery and the suspects' seizure normally would cut against a finding of reasonable suspicion, here, the lack of temporal proximity favors the government because the suspects were likely trapped within the perimeter during

---

[7] That Mr. Parker and Mr. Rollerson did not testify does not suggest otherwise. They did not bear the burden of proof.

that time and could not move further along. *Ante* at 16-18. But the record does not support the significance my colleagues accord to Detective Booher's testimony about the "perimeter" police set up approximately two blocks away from the site of the robbery. At the outset, the majority concedes that the evidence was insufficient to support the trial court's finding of a "secure" perimeter. *Ante* at 15. This concession comes close to being conclusive, as a perimeter's security is the thing that instills the confidence that suspects located within that perimeter—assuming other characteristics check out—are the suspects police are looking for. The majority nevertheless concludes that, secure or not, "the term 'perimeter' in this context can only mean that the police positioned themselves around the block" and that "it was reasonable for [police] to suspect that people inside the perimeter were aware that the perimeter existed."[8] *Ante* at 15.

As an initial matter, my colleagues acknowledge that nothing in the record

---

[8] The majority's statement that "perimeter" can mean only one thing is at odds with the fact that Detective Booher himself used "perimeter" to refer both to the area generated by the Find My iPhone application on someone's cell phone and to a geographic area that is the focus of a police search. And in fact, the trial court's only mention of the perimeter was in reference to the iPhone perimeter in its discussion of the seizure of *Mr. Ricks*, not Mr. Parker or Mr. Rollerson. *See* Suppression Hr'g Tr. 4, Apr. 21, 2016 ("MPD used GPS location information obtained from . . . the Find My iPhone application to secure a search perimeter in the area . . . the iPhone app established a perimeter area where the phone was and it led him directly to the complainant Ricks.")

explains why the police set up the perimeter where they did. *Ante* at 17 n.6. As Detective Booher explained it, officers used the Find My iPhone application to construct the perimeter, though there is no evidence that Mr. Parker or Mr. Rollerson (unlike Mr. Ricks) was in possession of anything being tracked by the application. Detective Booher could not describe how police determined the boundaries of the area he referred to as the "rectangle" or the "perimeter" because, again, he "did not get that specific" with Detective O'Donnell.[9]

According to the majority, these flaws in the evidence supporting the legality of the seizure of Mr. Parker and Mr. Rollerson "do[] not make the suspicion unreasonable" in part because a specific fact—namely, that the codefendant Mr. Ricks "was stopped in the area within ten minutes after the robbery"—is a strong counterweight that offsets the shortcomings in Detective Booher's testimony by demonstrating an immediately established and successful perimeter. *Ante* at 17 n.6; *see also ante* at 15-18. This claim that Mr. Ricks, linked to the robbery by the cell

---

[9] The record was a little clearer about the role the Find My iPhone application played in the officers' apprehension of Mr. Ricks, which Detective O'Donnell was personally involved in. Yet Detective Booher still said he did not know what the application displayed while Detective O'Donnell was using it to track a phone discovered on Mr. Ricks or whether Find My iPhone indicated an area larger than or contained within this "rectangle." He also was not sure whose phone police used— he thought Detective O'Donnell's but said "he could be mistaken." Detective Booher "did not get that specific with" Detective O'Donnell, who informed him only that Find My iPhone "pretty much led them directly to [Mr.] Ricks."

phones in his pocket, was stopped so quickly after the robbery, however, is yet another example of Detective Booher's testimony that's hard to trust and that might be clearly erroneous if the trial court had made a finding to this effect. As it stands, the trial court *actually* found that "officers responded to the robbery at 3:35 a.m." and apprehended Mr. Ricks "around 4 a.m." As Detective Booher never said what time Mr. Ricks was stopped, it is unclear on what evidence the trial court based "around 4 a.m."—perhaps an approximation of evidence not introduced at the hearing that Detective O'Donnell radioed that he stopped Mr. Ricks at 4:13 a.m. In any event, depending on the lag between the robbery itself and the officers' response to the robbery, the court's own finding suggests that it took between a half hour and forty-five minutes, not ten minutes, to find Mr. Ricks. While Detective Booher did testify that Detective O'Donnell told him Mr. Ricks was stopped ten minutes after the robbery, the court's findings and the objective evidence make clear this is mistaken and that the majority cannot reasonably rely upon the extremely prompt setup of the perimeter as a factor supporting the legality of the seizure of Mr. Parker and Mr. Rollerson.

Even setting aside the multiple levels of hearsay, on this record, we can only speculate about the nature of the perimeter, the competence of the police, and the extent to which people in the area were aware of the perimeter—all considerations that carry weight in the majority's conclusion that the seizure of Mr. Parker and Mr.

Rollerson was supported by reasonable suspicion. Detective Booher did not testify that no person was permitted to enter or leave the "rectangle" or that the streets within the perimeter were empty. He testified only that he had not "been made aware of anybody else that was stopped" or "hiding around that area" or of "any suspects" Detective O'Donnell saw while tracking the phone, which, while not irrelevant, is not as probative as an affirmative statement (even better if by an actual eyewitness) that there in fact were no other people around at the time the men were seized.[10] Reflecting Detective Booher's lack of personal knowledge, this testimony was "vague and unenlightening" as to the size of the perimeter, its security, and whether anyone else was present within it. *K.H.*, 14 A.3d at 1092; *cf. In re T.L.L.*, 729 A.2d 334, 341 (D.C. 1999) ("[T]he fact that the officers had information leading them to [the location of the seizure] can contribute to the articulable suspicion calculus only if the judge has been apprised of sufficient facts to enable him to evaluate the nature and reliability of that information."). In the light most favorable to the government, the record does not support the majority's view of the "perimeter" as a thing that mostly kept people on the inside in and people on the outside out and that was devoid of pedestrian traffic except for the suspects. It therefore likewise does not support

---

[10] The trial court's finding to the contrary—that "the detective testified that he was informed by Detective Booher that no other pedestrian traffic was seen in the area"—was clearly erroneous, and also confuses Detective Booher with Detective O'Donnell.

the majority's view of its pronounced relevance to the reasonable suspicion analysis.

The haziness of Detective Booher's suppression hearing testimony about the characteristics of the perimeter becomes even more stark when compared to the evidence at trial, where the defendants *were* able to question people who knew something about the perimeter. Challenging the nature of the perimeter was a key aspect of Mr. Parker and Mr. Rollerson's defense strategy—the prosecutor noted during a bench conference that in "each cross-examination" she was "addressing . . . the attack of the integrity of the perimeter." Trial Tr. 666, May 3, 2016. Those attacks produced a number of statements that cast doubt on the government's contention that the perimeter was established promptly and was firm. As noted above, my colleagues in the majority deem it reasonable to infer from the tenuous hearsay testimony at the suppression hearing that the perimeter was basically effective and that people inside the perimeter would be aware of its existence. But at trial Detective Lazarus testified that he did not see any officers on 55th Street, while Detective O'Donnell testified that the perimeter was not "impenetrable" and that he did not know whether "anybody came in or out." There was also testimony that the area near the perimeter can be a high traffic area, even in the very early morning hours.[11] This glimpse at how witnesses with at least partial familiarity with

---

[11] In closing argument counsel used the fruits of their impeachment of officers

the "perimeter" described it and how they responded to impeachment about those descriptions lays bare the comparative lack of knowledge and detail at the suppression hearing, where the sole witness struggled to shed any light at all on matters that are central to an evaluation of reasonable suspicion.

*Conclusion*

In sum, the suppression hearing testimony on the important facts informing reasonable suspicion is at least as unreliable in this case as it was in *K.H.*, where the hearsay testimony "that someone in apartment three said police were outside" and that "someone [was] going to run or something like that" failed to show "that an officer of 'reasonable caution' would have been warranted in believing the robber had gone into the apartment." 14 A.3d at 1091-92 (footnote omitted). It is possible

---

with firsthand knowledge, highlighting that those who testified about the security of the perimeter arrived at the scene on the late side and that there was no testimony about what time the perimeter was set up. Trial Tr. 593, 625, May 16, 2016; Trial Tr. 684, May 17, 2016. Among other things, counsel argued that the perimeter did not assist law enforcement in keeping track of the "two black males dressed in all black" who a 911 caller claimed to have seen "running south [on 55th Street] toward Nannie Helen Burroughs Avenue." Trial Tr. 594, May 3, 2016, Trial Tr. 593, May 16, 2016. Counsel also argued that the perimeter was not so airtight that the complainant's wallet, money, and marijuana did not apparently make their way outside of it, given that they were never recovered. Trial Tr. 593, May 16, 2016; *see also id.* at 625-26; Trial Tr. 705, May 17, 2016 ("Who's [sic] yard were they caught in? Who lives there? And what time was it? It wasn't 3:38. We know that. The testimony was it was near two hours later. Right?").

the government could have produced reliable evidence that made its case on the legality of the seizure. But I would not draw the speculative inferences the majority draws, rely uncritically on the rule allowing hearsay in suppression hearings, and overlook the holes in the evidence presented at the suppression hearing. We should instead follow the precedent of *K.H.*, reverse Mr. Parker's and Mr. Rollerson's convictions, and remand for a new trial at which the fruits of the illegal detention are suppressed.[12]

---

[12] The government does not argue that the trial court's failure to suppress fruits of this seizure was harmless, which means we will affirm these convictions "only when harmlessness is obvious." *See Randolph v. United States*, 882 A.2d 210, 223 (D.C. 2005) (reversing one appellant's convictions where it was "at least debatable" that the erroneous admission of hearsay testimony was not harmless and where the government was not claiming harmless error). The most conspicuous fruits of this seizure are the on-scene identifications of the men by the complainant. *See, e.g.*, *K.H.*, 14 A.3d at 1092-93 (excluding out-of-court identification of defendant as the fruit of an illegal seizure). And the admission of these identifications—which occurred shortly after the robbery—was not decidedly harmless. Though the complainant identified Mr. Parker and Mr. Rollerson in court, this identification occurred months after the on-scene identification, and "[t]he notion that . . . the jurors relied solely on the in-court identifications and were not influenced at all by the testimony regarding the show-up identification, is contrary to common experience and, indeed, flies in the face of common sense." *Ellis v. United States*, 941 A.2d 1042, 1049 (D.C. 2008) (reversing conviction where show-up identification should have been suppressed, despite reliable in-court identification); *see In re T.L.L.*, 729 A.2d at 343 (same).